# EXHIBIT "A"

1  BRUCE J. WECKER (CA Bar No. 078530)
   bwecker@hausfeld.com

2  HAUSFELD LLP
   600 Montgomery Street, Suite 3200

3  San Francisco, CA 94111

4  415-633-1908 tel
   415-358-4980 fax

5  *Attorneys for Plaintiff PREMIER FLOOR CARE, INC.*

6

7

ENDORSED
FILED
ALAMEDA

MAR 12, 2021

CLERK OF THE S
By *TANIA PIERCE*

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                        **COUNTY OF ALAMEDA**

9

10  PREMIER FLOOR CARE, INC., a Nevada    ) CASE NO. _____ Rg21092091
    corporation,                         )

11                                       )

12                    Plaintiff,         ) **COMPLAINT FOR**
                                         )

13                                       )

14       vs.                             ) **1)   FRAUD**
                                         )

15                                       ) **2)   BREACH OF CONTRACT;**
                                         )      **BREACH OF COVENANT OF**

16  ALBERTSON COMPANIES, INC. and        )      **GOOD FAITH AND FAIR**
    SAFEWAY, INC., Delaware corporations )      **DEALING**

17                                       )
                                         ) **3)   CIVIL CONSPIRACY**

18                    Defendants.        )
                                         ) **4)   UNFAIR COMPETITION LAW**

19                                       )      **VIOLATIONS**
                                         )

20                                       ) **DEMAND FOR JURY TRIAL**

21

22

23

24

25

26

27

28

COMPLAINT                                        CASE NO. _____

1    Plaintiff Premier Floor Care, Inc. ("Premier" or "Plaintiff") hereby files its Complaint

2    against Defendants Albertson Companies, Inc. and Safeway, Inc. ("Safeway" or "Albertson")

3    (collectively Defendants") for fraud, breach of contract, civil conspiracy and other causes of

4    action. For its complaint, Plaintiff alleges on personal knowledge as to its own acts and on

5    information and belief as to all other matters, as follows:

6                                            **PARTIES**

7    Plaintiff Premier is a corporation organized under the laws of the State of Nevada and has

8    its principal place of business in Brentwood, California.

9    Safeway, Inc. is a Delaware corporation, with its principal place of business in Pleasanton,

10    California.

11    Albertson Companies, Inc. is a Delaware corporation, with its principal place of business

12    in Boise, Idaho. Albertson also has an office, is registered to do business in, and operates in Contra

13    Costa County, California.

14    Unnamed parties that joined the conspiracy alleged herein include The Service Employee

15    International Union – United Service Workers West's (SEIU – USWW) ("SEIU" or "Union") and

16    King Janitorial Equipment ("King"), a competitive floor care service provider bidding for the same

17    contract Premier sought to obtain.

18                                  **JURISDICTION AND VENUE**

19    This is a civil action arising under the laws of the State of California for Breach of Contract,

20    and other causes of action.

21    This Court has jurisdiction over the subject matter of these civil claims pursuant to its

22    unlimited civil jurisdiction.

23    Venue is proper in this Court because: (a) Defendants, or some of them, can be found,

24    reside, or transact or have transacted business in Alameda County; (b) Defendants performed many

25    of the relevant acts and omissions in Alameda County; and (c) one of the contracts allegedly breach

26    contained a provision wherein the parties agreed to personal jurisdiction and venue in the state

27    courts in Alameda County.

28

1

COMPLAINT                                                    CASE NO. _____

## BACKGROUND AND INTRODUCTION

### 1. Premier's Long History of Success with Safeway as a Service Provider.

1. Premier began doing business with Safeway as a floor care independent contractor in 2001. Through 17 years, Premier provided Safeway with exemplary service, maintaining Safeway's flagship Northern California district that surrounded its corporate headquarters in Pleasanton, California. During the 2016 Safeway Golf Tournament, Safeway's President walked three of Premier's stores and stated that in all his career he had never seen a diamond shine floor like Premier's. During the portion of the period that Safeway had a Score Card program (approximately 2.5 years), Premier was the #1 contractor for the entire period.

2. Premier was the only African-American owned, African-American managed contractor providing janitorial services to Defendant Safeway, Inc. During the events described in this complaint, Premier paid its employees wages well in excess of what other janitorial employers paid their employees, and well in excess of the Union contractual agreements required. In fact, the Union's contractual pay scale in 2017 started for new employees at $10.75/hour, but Premier started its new employees off at $13/hour, when the starting pay per the Union contract was $9.10/hour Premier started its new employees off at $11.00/hour. Premier was the only janitorial contractor in Safeway's NorCal area who paid wages this high.

3. Premier obtained its initial contract with Safeway in around 2001, after the primary contractor at that time, Building One Service Solutions ("Building One"), was disqualified from continuing its contract due to its poor performance. During his time with Building One, its co-owner, Cedric Moore ("Moore") received the President's Award as well as an achievement award for managing six successful Safeway grocery store Grand Openings in one day. After Building One's collapse, he and co-owner Mike Pressley ("Pressley") sought to start a business of their own. With the encouragement of one of Safeway's Vice President's Kelly Griffin, Moore communicated with Safeway's contracting office to explore obtaining contracts that were becoming available. Thus, began a productive relationship with Safeway that ended with a contract, entitled Master Agreement for Floor Care-Janitorial Services, entered on June 21, 2015

COMPLAINT                                      CASE NO. _____

1    that provided an "Initial Term" to and including December 31, 2015. Exhibit A, hereto. In 2018,

2    Safeway joined with the Union to terminate Premier's contracts through a sham bidding process

3    that favored the Union's preferred contractor.

4    **2. Safeway Conspires With The Union And Its Preferred Employer King To Replace**

5    **Premier In 2018**

6        4.     Premier had always been on good terms with Safeway on an operational level,

7    except for when the Union would picket the stores Premier serviced around the time new contracts

8    were being considered by Safeway. The Union and Premier renegotiated contracts every two or

9    three years. If the Union picketed the stores, Safeway would routinely alert Premier, demanding

10    that Premier "handle it." In response, Premier was often forced to simply accede to the Union's

11    demands and sign the bargaining agreement with the Union to avoid issues with Safeway. The

12    Union's animosity toward Premier stemmed from Moore's refusal to enter into a multiemployer

13    agreement with other janitorial companies. Accordingly, Premier was not a part of any

14    multiemployer bargaining unit that negotiated with the Union, and it did not have to make any

15    decisions in conjunction with other janitorial companies. However, once the Union entered into an

16    agreement with a multiemployer bargaining unit, it took the agreement to Premier and demanded

17    that Moore sign off on the same agreement. If Premier were part of a multiemployer bargaining

18    unit, it would have no choice but to enter the same contract as the other employers. Instead, Premier

19    negotiated its own agreements with the Union.

20        5.     Since Premier provided its employees with more favorable wages and benefits, its

21    disputes with the Union tended to be regarding subsidiary issues. For example, in both the 2015

22    and 2017 negotiations, a principal issue concerned deported employees. Premier's employees were

23    documented immigrant workers, so the issue never actually impacted Premier; but it did, however,

24    raise a significant issue of seniority and implicated the employer's freedom to manage its own mix

25    of employees. Premier was only able to pay its workers above union pay scale and provide Safeway

26    with low bid proposals, due to its skillful management of satisfied employees working with

27    superior productivity. In 2015, Premier acceded to the demand regarding deported workers. In

28

3

1    2017, the Union again demanded the deported workers provision but additionally added an

2    additional issue in an attempt to advantage the other bidders in the Safeway bidding process, a

3    demand that Premier pay its employees even larger premiums over the agreed upon wage scales.

4    This time, Safeway conformed its vendor selection process to the demands of the Union, making

5    its choice of contractors a private process in which Premier was given no warning that its bid was

6    not being fairly considered, or even that additional picketing events were happening that would

7    allow Premier to bring resolution to the remaining disputed collective bargaining issues. In this

8    instance, Safeway rigged the process, preventing Premier from a fair opportunity to bid, and

9    awarded the contract to King, the contractor favored by the Union.

10        **3.   The 2015 Attempts by the Union to Drive Premier Out of Safeway**

11             6.       The Union had been agitating to have Safeway replace Premier for years. In 2015,

12    it engaged in tactics similar to those that led to the termination of Premier by Safeway in 2018.

13    These tactics were effective because they forced Premier to roll over and accept the Union's terms

14    or else jeopardize its contract with Safeway. When the Union picketed in 2015, Safeway contacted

15    Premier with concerns about the picketing and the tension between Premier and the Union. On

16    May 21, 2015, Safeway's VP of Labor Relations, Frank Jorgensen, reached out to Nicholas Hines,

17    Safeway's manager responsible for Northern California Labor Scheduling, regarding the

18    picketing: "We've been thru this before during their past negotiations with the SEIU. We are not

19    party to their negotiations and do not intend to tell them how to negotiate their contract. But they

20    need to know that, as their customer, we do not appreciate being drawn into their problems with

21    the union." Hines then wrote to Moore to alert him to the event: "Hi Cedric: This has come across

22    my desk and wanted to see if this is something we need to worry about. We are a union based

23    company, and have potential picketing going to occur at our properties. Please let me know what

24    is occurring or if this has been handled." He followed up, saying "Please let me know when this is

25    resolved as it has gone all the way to our CEO. I am getting the heat."

26             7.       On May 21, 2015, Moore immediately responded that he would take care of the

27    dispute while objecting to the Union tactic of pressuring Safeway in the midst of negotiations:

28                                                      4

    COMPLAINT                                                    CASE NO. _____

1   "We have been in touch with the union and discussed meeting to negotiate the contract. I'm not
2   sure why they're trying to get our attention this way, they already have it. We let them know we
3   look forward to sitting down with them. This is just a union tactic and I assure you it will be
4   settled."

5       8.      On June 12, 2015, while the negotiations with Premier continued, Union
6   representative, Ivonne Pasaran ("Pasaran"), sent an email to Hines entitled "Request for a
7   Meeting" stating in relevant part: "It came to the union's attention that Premier was awarded
8   Safeway Districts 2 and 10. This decision really surprised us. I would like to set up a time to meet
9   with you to talk about this development. This decision really worries the union because of the
10  reasons that we have mentioned to you before. Premier has clearly demonstrated that it is an
11  irresponsible contractor and is also not willing to resolve its disagreements with the union in good
12  faith."

13      9.      In another email from Pasaran to Hines, dated July 30, 2015, she stated: "I would
14  like to set up an appointment with you to talk about Premier floor care,unfortunately we are starting
15  to have problems with Premier, last night they implemented a reduction in hours per requirement
16  of Safeway, that's what they has [sic] told our members, obviously this affected directly our
17  members and their families and with that Premier again are violating our Collective Agreement,
18  first because they never notified to the Union that Safeway requested these changes andsecond
19  because they don't follow up the right process in situations like this (change of contractors) as per
20  our contract. Also is important that you know that King Janitorial is working and respecting the
21  contract agreement with us without problem."

22      10.     On August 24, 2015, Moore received the following email from Hines: "Cedric: we
23  have the union picketing our location in Dublin because of you. They are holding signs in mass
24  with your company name on it. This is not our issue to resolve, as you have told me that you had
25  signed contracts." Moore responded: "I looked into it and what they did was completely against
26  the contract and illegal. It was a secondary boycott. It shouldn't happen again because they know
27  charges can be filed against them . . . I'm sure that everything will work itself out, and the Union,

28

5

COMPLAINT                                                    CASE NO. _____

Safeway, and Premier will have a functional business relationship." After receiving pressure from Safeway due to the picketing, Moore had no choice but to sign the Union contract on their terms or risk losing his contract with Safeway. As detailed below, in 2017, Premier did not simply roll over and agree to the Union's picketing/pressure and, as a result, Premier suffered the ultimate retaliation – it lost its contract with Safeway and suffered catastrophic damages.

11.     In May of 2017, Union representative Pedro Malave ("Malave") threatened Premier, stating that Premier had to "sign the master agreement without any changes or [the Union] would shut down Premier and contact Safeway to stop doing business with Premier." Malave went on to threaten that if did not sign the master agreement, the Union was going to "blow up all of the Safeway stores." In other words, if the Union didn't get its way, it would engage in an unlawful secondary boycott against Premier's biggest client – Safeway – in an effort to destroy Premier's relationship with Safeway and ruin Premier's business. In fact, Premier's representative at the time warned the Union that its threats constituted a threat of a secondary boycott in violation of 8(b)3 and 8(b)4 of the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* The Union carried out its wrongful threat and the foreseeable consequences followed: Safeway terminated its contract with Premier

**4.      In 2017, Safeway Issues a Request for Proposal to Janitorial Vendors in its NorCal Districts**

12.     On July 27, 2017, Safeway put out a Request for Proposal for NorCal ("RFP"), inviting janitorial vendors to place their bids. It assured the invited bidders that it would engage in "a fair and thorough process." The proposal represented a binding agreement between Safeway/Albertson and Premier once Premier invested time and effort in drawing up its bid and submitting it in a timely manner. Safeway's own conduct confirmed the binding nature of this contract when it terminated Premier pursuant to the Section 6 of the RFP. The first round of proposals were due August 11, 2017. Safeway hoped to complete final service provider selection by the week of September 11, 2017. As part of the RFP, Safeway/Albertson designated Stephanie Evans ("Evans"), Albertson's National Manager of Floor Care, as the contact person in charge of

6

1   all communications with bidders in the RFP process. Safeway/Albertson committed to be

2   "extremely responsive to inquiries throughout this process" and promised to provide service

3   providers information via email "on a periodic basis throughout the process so that all quoting

4   service providers have the same information."

5       13.   It was important to Safeway that the vendors had a strong relationship with the

6   Union. In an August 2, 2017, email from Hines to Evans, he stated, "We do ask that the floor

7   vendors for the California stores have the employees that are in the union. I am unsure if we have

8   an agreement with the SEIU, but I know that we have had the SEIU picket our offices for issues

9   with the floor vendors." A few months earlier, Evans wrote to her team, "Also, here's the list of

10  vendors that I currently have to include. Since California has some unique restrictions due to union

11  agreements, the pool will be limited to vendors that already have business in California or a

12  relationship with the union(s)."

13  **5.    The Union's 2017 Direct Threats to Safeway**

14      14.   On August 9, 2017, two days before the bids were due, Malave of the Union

15  pressured Safeway by sending an email to Evans claiming that Premier was in breach of its contract

16  with the Union, accusing Premier of "wage theft," and threatening Safeway with liability for that

17  same "wage theft" because of its association with Premier. He further threatened Safeway by

18  telling Evans that: "Premier's posturing at the table is also creating a situation that could push our

19  membership into potential strike situation." The Union further claimed Premier was withholding

20  information and stated: "Hopefully Safeway can reconsider their current relationship with

21  Premier." *Id.,* (emphasis added).

22      15.   On September 12, 2017, Malave again wrote to Evans stating that there were

23  "worker claims of company miss treatment [sic] by Premier" and that "the situation is becoming

24  increasingly volatile." Later that same day, Malave sent another email to Evans, again belittling

25  Premier and singing the praises of another company—King: "Where King is paying contractually

26  bargained wage increases, dealing with issues that workers bring up and generally looking out for

27  the benefit of all its employees; premier is completely doing the opposite."

28

COMPLAINT                                                              CASE NO. _____

16.     No record exists of a written response by Safeway to Malave's false and defamatory assertions against Premier or suggesting that communications from a union with relations with all of the bidders should not be intervening in any manner in the Safeway RFP process.

**6.     Safeway Decides to Award Two Districts to Premier on November 8, 2017**

17.     After the second round of bidding, in October 2017, Hines circulated a list of proposed district assignments. He had assigned District 7 and District 10 to Premier. On October 31, 2017, Evans circulated the list to her team stating, "Once you've had a chance to review, please let me know if you have any questions or if you're ready to move on to the contract/vendor notification phase." On November 8, 2017, Richard ("Rick") Pickering ("Pickering"), Vice President of Safeway Operations, responded asking Hines to contact Adam Wampler ("Wampler), another VP of Operations of Safeway:

> Nick, Please get with Adam quickly to review the details. Running out of time for a q4 start. Adam, as we discussed there are two new companies we want to add the vendor pool. One would take on D1 and D2 (they are located in Marin). The second company would take on D3 and D4. The remaining vendors would be assigned to correspond with the new realigned districts.

18.     By the end of the day on November 8, 2017, everyone had agreed to move forward with Hines' proposed list. Wampler responded to Pickering's email (above), "I'm good with what Rick lays out below as long as the new vendors DO NOT spend any incremental money on supplies." Then Evans responded, "I just need NorCal's go ahead with that final alignment. The last update I had was that you would be reviewing with Adam. Once you're ready to move forward, I can start the process of notifying vendors and getting service agreements out." Wampler replied, "I think I'm good to go. Rick covered all details with me a few weeks ago so let's get this going so we can start Day 1 of Q4." Evans responded, "Yay! . . .I'll work with [the new vendors] on implementation plans before setting the rest in motion. . . This will definitely happen in Q4." Hines replied, "Good to go!"

COMPLAINT                                                                                CASE NO. _____

7.     **The 2017 Picketing Events**

19.     As reflected in Malave's communication with Safeway, the Union approached the 2017 Safeway contracting with extreme aggressiveness. The goal was to replace Premier, not complete the bargaining with Premier over the terms reached in the multi-employer agreement. King employee and Union steward, Alan Gallegos ("Gallegos"), took the lead explicitly communicating the goal to the picketing employees (virtually all of whom were not Premier employees) that King would replace Premier as the Safeway contractor for all of the Premier contracted stores. The message that the Union sent to its members to urge them to picket Premier's stores, and the message that the picketers were repeating to the public, that Premier was not paying fair wages, was false and defamatory. It was also designed to push the Union and King's agenda. It soon became the Safeway agenda as well.

8.     **The First Picketing Event**

20.     On November 22, 2017, just two weeks after Safeway decided to move forward with Premier, and before any formal announcements of the vendor selections, the first Union picketing event occurred. There was a large group of people gathering in the parking lot of the Alameda Safeway, but only about four of them appeared to be employees of Premier. Two of the Premier employees were long-time union supporters, while the other two were induced to come to the site by Gallegos on false pretense that a discussion of medical insurance would be occurring and that their questions regarding that could be answered. The Union leaders, including Gallegos, provided the picketers items such as picket signs, leaflets, drums, noisemakers, and bullhorns. The picketers engaged in very loud chanting, which very often was more like screaming. Once the drums, noisemakers, picket signs, bullhorns and the like were distributed to the picketers by Gallegos and the other Union representatives, Gallegos prepared to lead the group from the parking lot toward the Safeway store. Before he did, however, Gallegos stated to the picketers that: "we are doing this to get Premier out of the Safeway stores and get King in." Gallegos further told the group of picketers that Premier didn't want to sign the Union contract and because of that, they were going to take the stores away from Premier and give them to King

9

because King would give its employees better benefits than Premier. During the picketing in front of the store, it also would have been very difficult for the customers or the employees to access the shopping carts. The picketers then marched from the parking lot toward the Safeway store. While marching, everyone was chanting very loudly (often screaming), banging drums, yelling, using noisemakers, and shouting through bullhorns. They reached the front of the store and all entered the store. They were in a line, but the line was four persons across. They then continued to walk all around the inside perimeter of the store—through the produce department, meat department, bakery, etc., until they had made a complete circle inside the store. The picketers were in the store for about 15 minutes. During that time, customers and the Safeway employees had to stop what they were doing and stood there watching the picketers.  The workers stopped working and the shoppers stopped shopping. During the time the picketers were in the store, they were blocking the aisles. While in the store, the picketers engaged in the same conduct in which they had participated in the parking lot: outside carrying picket signs, chanting, yelling, shouting through bullhorns, using noisemakers, and banging drums.

21.    After about 15 minutes in the store, the picketers started to make their way out. After they left, the store manager told them they could not go back into the store because they were disrupting the business; the workers couldn't work and the shoppers couldn't shop. The picketers then started marching back and forth in front of the store. A short time later, the same manager told them they could not picket there because they were blocking the entrances/exits to the store, customers and employees couldn't get in or out, and that the police had been called because of the disruption. The picketers handed out flyers both inside and outside of the store.

22.    Significantly, Safeway characterized the Union's activities on November 22, 2017 as "picketing" with "signs." In an email dated the same day, Safeway Store Manager Kimberly Davis ("Davis") stated: "Good afternoon everyone, today at noon 30 to 40 picketers showed up with bull horns and signs to demonstrate. They marched in the store around the perimeter of the store using the bull horn and drums scaring customers. I called the police immediately to try to contain them to one area where they were not making it impossible for customers to shop. The

10

1    police were successful once they arrived." The email from Davis was entitled "Picketers @ 2708

2    – 4," a reference to the Safeway store number.

3         23.    As he had done in the past, Hines immediately contacted Moore advising him of the

4    picketing event.

5    **9.    The Second Picketing Event**

6         24.    Just eight days later, on November 30, 2017, there was a second Union picketing

7    event. Jose Sanchez, a former Premier employee arrived shortly before 11 a.m. and observed

8    approximately 50 people gathered in the parking lot of the Pleasanton Safeway. Gallegos was there

9    and appeared to be in charge. There were also four or five other people from the Union there. Just

10   like the prior picketing event in Alameda, they were given picket signs, T-shirts, noisemakers,

11   drums, bullhorns, and the like. They were again told by Gallegos that their mission was to get

12   Premier out of the Safeway stores and to get King in. They then marched toward the Safeway store,

13   entered the store and marched around the inside perimeter of the store. After picketing inside the

14   store, the picketers marched back and forth in front of it. Again, the manager of this Safeway store

15   told them that they were not to picket inside the store because they were interfering with the

16   employees' ability to work and the customers' ability to shop, and further, that they were not to

17   picket directly in front of the store because they were blocking the entrances/exits. The police were

18   called once again by Safeway and the event was over. Sanchez saw a number of picketers getting

19   in and out of white vans, which he understood to be people that the Union had brought in to picket

20   the store. In short, the second picketing event was a repeat of the first. But this time, Premier

21   received no report from Safeway until January, after it had learned of the additional picketing

22   events and requested incident reports. On information and belief, the months of radio silence from

23   Safeway was designed to force Premier out of its contract and replace it with King.

24   **10.    The Third Picketing Event**

25         25.    On or about December 7, 2017, approximately eight days after the second Union

26   picketing event, there was a third Union picketing event, this time at the Livermore Safeway. Like

27   the two other events, Gallegos, was in charge, and the attendees went through almost the exact

28

11

same process as at the prior two events. They all assembled in the parking lot; they marched toward, into and throughout the Safeway store with t-shirts, picket signs, flyers, noisemakers, bullhorns, and the like, screaming loudly and chanting; were told by the store manager that they were interfering with the employees ability to work and the customers' ability to shop; and were told they were not to re-enter the store and that they were blocking entrances and exits when they were picketed in front of the store. They left after the police were called. This time there were an estimated 70 picketers at this third event and that it lasted about an hour in total. Once again, Gallegos repeated his statement that the Union was there to drive Premier out of the Safeway stores (because, he claimed, they were not paying proper benefits to their workers) and to replace Premier with King. Again, no incident report was provided to Premier. Within days of this event, Premier began to hear rumors from its supervisors that night crew managers/employees in several stores in Oakland (District 4) that Premier was losing the contract for those stores.

**11.    The Fourth Picketing Event**

26.    On February 9, 2018, a fourth picketing event occurred at the San Leandro Safeway location. In an article published in the *San Leandro Times* on February 15, 2018, entitled Safeway Janitors Drum Up Support, the author states: "Janitors picketed in front of the downtown Safeway last Friday afternoon, saying they're not getting fair pay and benefits." "The pickets, organized by the Service Employee International Union – United Service Workers West (SEIU – USWW), was directed at their employer Premier Floor Care, which is contracted by Safeway to clean the store."

**12.    Safeway Reverses its Prior Decision and Terminates its Contract with Premier.**

27.    Premier's payment of high wages to its employees created conflict with the other Safeway contractors, putting pressure on them to match Premier's wages. Premier refused to join with other contractors who had formed a multi-employer bargaining unit with the SEIU. Premier's superior treatment of its workers also put substantial pressure on the Union leadership in negotiating agreements with the multi-employer bargaining group. As described above, the Union had clearly encouraged its representatives to turn labor activities into an effort to favor its preferred companies over Premier and to draw Safeway into the disputes by illegal boycotting activities. The Union's

COMPLAINT                                                                                          CASE NO. _____

success in that regard was willingly joined by Safeway resulting in the termination of Premier on March 25, 2018.

28.     Safeway routinely advised Premier of events such as the picketing events described above. When the first event occurred in November, Hines emailed Moore alerting him to the event. But the heat the Union applied caused Safeway to change that practice, and virtually all communication between Safeway and Premier regarding the Union dispute and the RFP abruptly ended.

29.     After the November 8 emails in which Safeway awarded the two districts to Premier, the e-mail correspondence produced by Safeway regarding the bidding process reflected a large gap until January of 2018. Interestingly enough, this period of radio-silence covers exactly the time when all of a sudden Safeway establishes a third round of bidding and excludes Premier from the process. Instead, during that period of time discussions within Albertson/Safeway seem to have turned to simply replacing Premier's districts with King.

30.     On January 26, 2018, Evans wrote to Hines, "Nick - I just need the final breakdown of how NorCal wants to award contracts so we can start issuing terminations and getting transitions lined out. With D1 going to Township, you mentioned awarding Premier's stores to King and keeping Alliance, Mr. Clean and Jani-King as is. Is that the final alignment?" Hines replies, "That is correct." On February 26, 2018, Evans e-mailed Premier's termination notice, effective March 25, 2018.

**13.     Safeway Fraudulently Concealed Its Fraudulent and Conspiratorial Activities**

31.     On March 1, 2018, Moore emailed to Evans his surprise at losing the bid:

I was surprised by Albertson's decision to terminate Premier's contract after having been a loyal and award-winning floor care provider for over 18 years. After initially receiving favorable feedback in the RFP process, I cannot imagine that this decision was based on economics. Rather, the timing shortly after the latest labor action taken against Premier by the Union appears to indicate that Albertson's has bowed to the pressure of the illegal union picketing. ... It would be a shame if Albertson's has been put in the position of condoning and/or supporting illegal economic pressure exerted by third parties. Please contact me as soon as possible in order to discuss the reasons for the termination.

COMPLAINT                                                                          CASE NO. _____

32.     Safeway failed to respond. It was not over a year later in the course of discovery in Premier's case against the SEIU (Premier Floor Care Inc. v. Service Employees International Union, United Service Workers West, Case No. 4:18-cv-01851-HSG (N.D.Cal.)) that Safeway's sham bidding process became known to Premier.

## COUNT I
### (Fraud & Misrepresentation)

33.     Plaintiff re-alleges and incorporates herein by reference, as though fully set forth here, all preceding paragraphs of this Complaint.

34.     Safeway committed actual fraud, and misrepresentation, within the meaning of California Civil Code §1572, as a party to a contract with Premier, with its connivance, and with intent to deceive Premier. It favored King in the sham RFP bidding process and did not permit Premier to have a fair and equal opportunity to bid for its contracts.

35.     Safeway's fraud and misrepresentation resulted in Premier's injury and damage in an amount to be determined at trial of this matter,

## COUNT III
### (Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing)

36.     Plaintiff re-alleges and incorporates herein by reference, as though fully set forth here, all preceding paragraphs of this Complaint.

37.     On or about June 21, 2015, Premier and Safeway entered into a written agreement, a copy of which is attached hereto as Exhibit "A" and made a part hereof. By the terms of said written agreement, absent termination, Premier would provide floor care services for Safeway grocery stores through December 31, 2018.

38.     The consideration set forth in the agreement was fair and reasonable.

39.     Plaintiff had performed all conditions, covenants, and promises required by him on his part to be performed in accordance with the terms and conditions of the contract.

14

40.    On or about March 25, 2018, Safeway breached the agreement by terminating Plaintiff for reasons of its concerted activities with the labor union representing Premier's employed.

41.    By reason of Safeway's breach of the contract as herein alleged, the plaintiff has suffered damages in an amount to be determined at trial of this matter, and has included attorney's fees in enforcing the contract.

## COUNT IV
### (Civil Conspiracy)

42.    Plaintiff re-alleges and incorporates herein by reference, as though fully set forth here, all preceding paragraphs of this Complaint.

43.    Plaintiff was harmed by the Union's illegal activities in violation of 29 U.S.C. § 141 *et seq.* Section 8(b)(4) of the Labor Management Relations Act forbids specific concerted nion activities such as secondary boycotts. Specifically, Section 8(b)(4)(ii) of the Act concerns conduct directed at secondary (neutral) employers and prohibits a Union from threatening, coercing, or restraining the secondary employer so that the secondary employer ceases doing business with the primary employer. As demonstrated below, the Union's picketing of Safeway stores in 2017 and 2018 violated Section 8(b)(4)(ii) 29 U.S.C. § 141 *et seq.* n that it was: (1) threatening, (2) coercive, and (3) the objective was clearly to interfere with the business relationship between Safeway and Premier were (1) threatening, (2) coercive, and (3) the objective was to interfere with the business relationship between Safeway and Premier. Safeway is responsible for the harm because it joined in a conspiracy to commit these activities by joining with the Union and King to implement an unfair and sham bidding process that resulted in King replacing Premier as Safeway contractors.

44.    Safeway was aware that the Union and King planned to coerce and threaten Safeway; and it agreed with the Union and King and intended that the Premier termination to serve the purposes of the conspirators.

45.    Safeway's participation in a civil conspiracy resulted in Premier's injury and damage in an amount to be determined at trial of this matter.

## COUNT V
### (Unfair Business Acts and Practices in Violation
### of California Business & Professions Code §§ 17200, et seq.)

46.     Plaintiff re-alleges and incorporates herein by reference, as though fully set forth here, all preceding paragraphs of this Complaint.

47.     California Business and Professions Code §§ 17200, et seq. prohibits acts of unfair competition, which means and includes "any unlawful, unfair or fraudulent act or business practice".

48.     Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unfair competition and violations of law. Defendants' acts and practices with respect to their conspiracy with the Union and a competing vendor, and with respect to their sham bidding process are fraudulent, unfair and/or illegal. Plaintiff has been damaged and will continue to suffer damage, if Defendants' conduct is not enjoined and provide such other relief as it is entitled to under Business and Professions Code §§17200, et seq., as detailed herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

a)   That this Court find that Defendants committed actual fraud and misrepresentation in connection with its contracts with Plaintiff resulting in the bad faith termination of Plaintiff's contract;

b)   That this Court find that Defendants breached their agreements with Plaintiff including breaching the covenant of good faith and fair dealing implied into every contract resulting in the bad faith termination of Plaintiff's contract;

c)   That this Court find that Defendants joined in a civil conspiracy with either the SEIU and/or King Janitorial resulting in the bad faith termination of Plaintiff's contract; and

d)   That this Court award Plaintiff compensatory, general, special and treble damages and attorney's fees according to proof at trial;

COMPLAINT                                                    CASE NO. _____

1    e)   That this Court grant Plaintiff such other and further relief, in law or in equity, both

2         general and special, to which it may be entitled.

3

4    Dated: March 12, 2021                    Respectfully submitted,

5                                             /s/ Bruce J. Wecker

6                                             BRUCE J. WECKER (CA Bar No.
                                              078530)
7                                             bwecker@hausfeld.com
8                                             HAUSFELD LLP
                                              600 Montgomery Street, Suite 3200
9                                             San Francisco, CA 94111
10                                            415-633-1908 telephone
11                                            415-358-4980 fax
12                                            *Attorneys for Plaintiff PREMIER FLOOR CARE, INC.*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                                          CASE NO. _____

# EXHIBIT A

CW052215PFC.02



**SAFEWAY**

THE SAFEWAY COMPANIES
Safeway • Vons • Pavilions • Dominick's • Carrs
Tom Thumb • Randalls • Genuardi's • Pak'n Save

# MASTER AGREEMENT

# FOR

# FLOOR CARE – JANITORIAL SERVICES

# BETWEEN

# SAFEWAY, INC.

# AND

# PREMIER FLOOR CARE, INC.

CW052215PFC.02

# MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement") dated as of June 21, 2015 (the "Effective Date"), is by and between Premier Floor Care, Inc. with principal offices at 2248 Meridan Boulevard, Suite H, Minden, NV 89423 (herein referred to as "Service Provider"), and SAFEWAY, INC., a Delaware corporation, with principle offices at 5918 Stoneridge Mall Road, Pleasanton, California 94588, and on behalf of itself and its subsidiaries (collectively, "Safeway").

**ARTICLE I—General Terms and Conditions**

**1.1    Purchase and Sale of Services**

Subject to the terms and conditions of this Agreement, Service Provider shall provide to Safeway the Services(s) described in Exhibit A and Exhibit C pursuant to and in conformity with such Exhibits. The applicable prices ("Prices") for the Services shall be as specified in Exhibit B, and shall remain fixed for the term of this Agreement. Any Services for which Prices are not set forth on Exhibit B will be priced according to the mutual agreement of Safeway and Service Provider.

**1.2    Competitive Costs**

Service Provider agrees to maintain, in accordance with legitimate industry standards and practices, Prices that promote Safeway's ability to compete in its markets. If a third party ("Offeror") offers Safeway an opportunity to purchase Services from another source at a *bona fide* price lower than the Prices hereunder, Safeway may purchase such third-party Services only to the extent that such Services meet the applicable Specifications and are offered to Safeway on terms not materially less favorable to Safeway than the terms hereof.

**1.3    Extra Charges**

Safeway shall incur no charges under this Agreement other than those included in the Prices, or related Work Orders, unless such charges have been approved in writing by Safeway.

**1.4    Non-Exclusive Market**

It is expressly understood and agreed that this Agreement does not grant Service Provider an exclusive privilege to provide to Safeway any or all Services of the type described in this Agreement, nor does it require Safeway to purchase or license any Services. It is understood, therefore, that Safeway may contract with other Service Providers for the procurement or trial of all or any part of comparable Services and that Safeway may itself perform all or any part of the Services described herein.

CW052215PFC.02

### 1.5   Term of Agreement

This Agreement is effective June 21, 2015 and shall remain in effect for a term ending December 31, 2018 (the "Initial Term") unless earlier terminated pursuant to Section 1.6 below. So long as Safeway is not in default hereunder, Safeway shall have the option of renewing this Agreement for one additional year upon written notice to Service Provider of its intent to renew.

Neither the termination nor expiration of this Agreement shall affect the obligations of either Party to the other Party pursuant to any Order previously executed hereunder, and the terms and conditions of this Agreement shall continue to apply to such Order as if this Agreement had not been terminated.

### 1.6   Termination

Either party may terminate this Agreement upon written notice to the other party if:

(a) The other party commits any material breach of this Agreement and fails to cure such breach within thirty (30) days after written notice or, if the breach cannot be cured within thirty (30) days and the non-breaching party is not materially prejudiced thereby, fails within that period to commence, or thereafter to pursue, diligent efforts to cure the breach;

(b) The other party's performance is materially excused pursuant to Section 8.5 for a period of ninety (90) days or more, or which is reasonably expected to equal or exceed ninety (90) days; or

(c) The other party becomes insolvent, admits in writing its insolvency or inability to pay its debts as they become due; is unable to or does not pay its debts as they become due; makes or proposes a general assignment for the benefit of creditors; convenes or proposes to convene a meeting of its creditors or any class thereof for purposes of effecting a moratorium upon or extension or composition of its debts; proposes any such moratorium, extension or composition; files or otherwise commences a proceeding in bankruptcy, reorganization, liquidation or debt relief under any law in any jurisdiction; has a proceeding in bankruptcy, liquidation, or other debt relief under any law in any jurisdiction filed against it which is not dismissed within sixty (60) days after filing; or if any receiver, trustee, liquidator or custodian is appointed to take possession of any substantial portion of such party's assets

Either party may terminate this Agreement at any time, with or without cause, by providing the other party sixty (60) days' prior written notice thereof.

### 1.7    Review Periods and Reports

Safeway and Service Provider agree to meet, at the reasonable request of either party, once per quarter to review service, key performance indicators, and market conditions as described in Exhibit A and C.

### 1.8    Records and Audits

Service Provider agrees that it will:

1.  Maintain complete and accurate records related to the Services provided by Service Provider to Safeway, including records of all amounts billable to and payments made by Safeway in accordance with Generally Accepted Accounting Principles, uniformly and consistently applied in a format that will permit audit;

2.  Retain such records and reasonable billing detail for a period of at least three (3) years from the date of final payment for Services;

3.  Provide reasonable supporting documentation to Safeway concerning any invoice amount within twenty (20) calendar days after receipt of written request ; and,

4.  Permit Safeway and its authorized representatives to inspect and audit, during normal business hours, the charges invoiced, services provided, and compliance with regulations, standards, and this Agreement.  Should Safeway request an audit, Service Provider will make available any pertinent records and files to Safeway during normal business hours at no additional charge.

**ARTICLE II - Service Requirements**

**2.1  Service Level**

Service Provider shall deliver not less than 98.5% of the Service(s) on time and in accordance with Orders issued with the applicable Standard Lead Time. Should Service Provider's service level drop below such 98.5% level for fifteen (15) consecutive days, Safeway may so notify Service Provider in writing.  If Service Provider fails to improve the service to such 98.5% level or better within fifteen (15) days after receipt of such notice, Safeway shall have the right to purchase the Services from third parties until such time as Service Provider provides Safeway reasonable assurances that Service Provider is willing and able to satisfy the foregoing service standard, and Service Provider shall be responsible for any reasonable additional cost incurred by Safeway in purchasing such substitute services.

**2.2  Licenses and Permits**

Service Provider shall obtain and pay for all necessary licenses, permits and fees and shall maintain all necessary licenses, permits, and other authorizations from governmental agencies, adjacent properties, and Safeway's landlord.

**2.3  Conduct**

Service Provider will cause its employees and permitted subcontractors working on Safeway's premises to comply with all Safeway rules and regulations applicable thereto, including (but not limited to) safety rules, dress code, and business-like conduct.  Safeway may at any time reasonably request that Service Provider remove one or more workers from Safeway's premises. Safeway reserves the right to bar any one or more individuals from its premises.

**2.4  Tools and Equipment**

Service Provider shall provide all labor, materials, services, and equipment required for performance of the Services.  Safeway shall not be responsible for loss or damage to tools, equipment, or materials belonging to Service Provider or its employees.  Service Provider shall use only Safeway-approved materials and equipment.

Service Provider shall not use any equipment inside Safeway premises that emits carbon monoxide or other toxic or noxious gases, provided that Service Provider may use propane powered strippers that meet all applicable OSHA, air quality, carbon monoxide and noise requirements for the community and the premises in which they are used.  Such propane powered strippers shall be equipped with carbon monoxide detector hang-tags, which shall be replaced periodically in accordance with manufacturer specifications.  Neither propane tanks nor such equipment may be stored on Safeway premises.

CW052215PFC.02

## 2.5 Locations

Exhibit B to this Agreement contains a list of all stores and locations for which Service Provider shall provide Services hereunder. Safeway reserves the right to add or delete locations from Exhibit B, and to change (increase or decrease) service levels, frequency of service, and scope of work at stores listed thereon, at its sole discretion, by providing thirty (30) days' advance notice. Stores that are closed for business by Safeway will automatically be removed from Exhibit B on the effective the date of closing even if Safeway has not formally notified Service Provider. Prorated adjustments for closed stores will be made for prepaid services that are no longer needed.

## 2.6 Building and Fixtures

Service Provider shall not remove or alter any part of the building or fixtures without first obtaining the approval of Safeway's authorized representative.

## 2.7 Resolution of Defective Work

Unless otherwise agreed upon, if within thirty (30) calendar days after the date of completion of any work hereunder, any part of the material or workmanship furnished by Service Provider or by any permitted subcontractor shall prove to be defective, Service Provider agrees to replace or repair the defective part or redo substandard workmanship to the satisfaction of Safeway and without cost to Safeway, upon receipt of written or verbal notice of such defect from Safeway. No payment made or inspection performed by Safeway under this Agreement shall be deemed to be evidence of either performance of such work or acceptance of defective work or materials. Safeway shall not be required to pay Service Provider hereunder for such defective work until corrected.

## 2.8 Materials

Service Provider guarantees that all goods, chemicals, and materials installed in or brought into Safeway's buildings or property by the Service Provider and services provided by Service Provider in Safeway's buildings or property will meet all Federal, State, and local requirements. Service Provider shall furnish hazardous materials classifications, as well as the Bureau of Explosives certifications, where required (Code of Federal Regulations Title 49 Parts 100-199). Service Provider agrees to comply with the terms and conditions of Safeway's Hazard Communication Program, as amended by Safeway from time to time.

## 2.9 Prevailing Wages

Service provider agrees to pay its employees not less than prevailing AFL-CIO wages and benefits, if any, in all applicable geographic regions.

## 2.10 Subcontractors

Except to the extent expressly permitted by Safeway, in writing, Service Provider shall use its own forces, and shall not hire subcontractors, to perform Services under this Agreement.

CW052215PFC.02

**ARTICLE III – Representations and Warranties**

**3.1     Conflict of Interest**

Service Provider represents and warrants that no officer, director, employee, or agent of Safeway has been or will be employed, retained or paid a fee, nor has any such person received or been promised any personal compensation or consideration, by or from Service Provider or any of Service Provider's officers, directors, employees or agents in connection with the obtaining, arranging or negotiation of this Agreement or other documents entered into or executed in connection with this Agreement.

**3.2     Service Provider Organization**

Service Provider hereby represents and warrants that it is a corporation in good standing under the laws of the State of California, with full rights to sue and to be sued.  Service Provider further warrants that it is duly authorized to enter into and to perform this Agreement in accordance with its terms, and that neither this Agreement nor the performance hereof shall in any material respect violate the terms of any statute, rule, or governmental order to which it may be subject or any material instrument, agreement, or contract to which Service Provider is a party.

**3.3     Worker Eligibility**

Without limiting Service Provider's other obligations under this Agreement, Service Provider assumes full and sole responsibility for compliance with all laws applicable to its performance hereunder including (but not limited to) those regulating the employment relationship between Service Provider and its employees, including (but not limited to) compliance with all laws relating to: eligibility to work in the United States of America, gathering and retaining evidence of such eligibility, and payment of all straight time and overtime wages in compliance with State and Federal wage and hour laws. Service Provider further agrees to ensure that each of its subcontractors complies with the foregoing requirements. At Safeway's request, Service Provider shall provide verification of its compliance, and the compliance of each subcontractor, with the foregoing requirements.  Safeway shall have the right, by and through its own employees or a third party auditor, upon not less than ten days prior notice and during regular business hours, to perform an audit of Service Provider's records to the extent necessary or appropriate to confirm Service Provider's compliance with the foregoing provisions.

Service Provider agrees to comply with all laws forbidding discrimination in employment on the basis of race, sex, national origin, religion, age, disability or any other basis prohibited by the law of the State in which the services are to be performed.

**3.4     Safeway's Representations**

Safeway hereby represents and warrants that it is a corporation in good standing under the laws of the State of California, with full rights to sue and to be sued.  Safeway further warrants that it is duly authorized to enter into and to perform this Agreement in accordance with its terms, and that neither this Agreement nor the performance hereof shall in any material respect violate the terms of any statute, rule, or governmental order to which it may be subject.

### ARTICLE IV—Indemnity and Insurance

**4.1     Indemnification.**

Service Provider agrees to indemnify, defend (upon request by, and with counsel satisfactory to, the Safeway Parties) and hold Safeway and its subsidiaries and its officers, directors, partners, employees and agents (collectively, the "Safeway Parties"), harmless from and against any and all liabilities, claims, demands, losses, damages, costs and expenses, including, without limitation, attorneys' fees and costs (collectively "Claims"), arising in connection with the performance of this Agreement by Service Provider, its subcontractors, or its or their agents or employees, whether foreseeable or unforeseeable, direct or indirect, including, without limitation, Claims for death or injury to any person or damage to any property or loss of use thereof.  The provisions of this Section shall survive the completion or termination of this Agreement.

Service Provider will indemnify and defend Safeway in the event a suit is filed against Safeway on behalf of the Service Provider's employees relating to wages, hours, breaks and meal periods, workers compensation, benefits, or any other issue relating to Service Provider's compliance with state and federal laws concerning its employees.  Service Provider also agrees to waive any rights of subrogation against Safeway in any claims or suits filed by Service Provider employees.

Service Provider agrees to reimburse Safeway for any demonstrated damages (at a reasonably hourly rate) to Safeway's property, including investigation costs, by Service Provider, its employees, agents, or subcontractors within thirty (30) days of notice from Safeway. Service Provider will supply a list of all active employees that work in our stores for the Service Provider or by any subcontractor. All employees of the Service Provider shall be required to have a current Photo ID on their persons while on Safeway premises. Service Provider shall provide the division Floor Care Manager a list of all Service Provider employees working in the Division's stores if requested.  Service Provider shall reimburse Safeway Five Thousand Dollars ($5,000) for each instance of Service Provider failing to replace an employee barred for illegal or dishonest acts hereunder.

**4.2     Insurance Requirements**

**A)**     Service Provider shall obtain and maintain, at its expense, a policy or policies of Commercial General Liability insurance (including product and completed operations, personal and advertising injury and contractual liability coverage), with a minimum of $2,000,000 per occurrence and a minimum of $2,000,000 per occurrence Products and Completed Operations, each with an aggregate limit of not less than $4,000,000 and written on an occurrence form. Service Provider shall also obtain and maintain, at its expense, (i) a policy or policies of Workers' Compensation insurance with statutory limits; (ii) Employers' Liability (Stop-Gap Liability) insurance with minimum limits of $2,000,000; and (iii) Automobile Liability Insurance with a minimum of $2,000,000 coverage limits for each accident, including owned, non-owned and hired vehicles.

**B)**     Service Provider will provide Certificates of Insurance naming Safeway, Inc. as "Additional Insured" with respect to Commercial General Liability and Auto Liability policies.  Service Provider's insurers shall be rated "A-" or better by A.M. Best Company.  Service Provider shall provide Certificates of Insurance, evidencing the required coverage, prior to supplier start date of June 21, 2015 from Safeway, and shall provide updated Certificates of Insurance when coverage is

renewed or materially changed, or as may otherwise be requested from time to time by Safeway.

**C)**   Policy limits may not be reduced, terms changed, or policy canceled upon less than thirty (30) days prior written notice to Safeway. Service Provider's insurance shall be primary with respect to all obligations assumed by the Service Provider under this Agreement.  It shall be the responsibility of the Service Provider to ensure that its agents, representatives, subcontractors and independent contractors comply with the above insurance requirements. Insurance coverage and limits referred to above shall not in any way limit the liability of the Service Provider.

**D)**   Service Provider shall obtain and maintain Crime Insurance, in the amount of not less than $250,000 per occurrence, to cover Safeway's loss of money and property due to theft, embezzlement, wrongful extraction, or defalcation on the part of Service Provider or its employees.

**E)**   Insurer to bind coverage on its behalf and documentation of said coverage shall be submitted to:

Safeway, Inc.
Attn: Strategic Sourcing Indirect Group Manager
5918 Stoneridge Mall Road
Pleasanton, CA  94588

**ARTICLE V— Invoice Policy and Procedures**

**5.1     Agreed-Upon Pricing.**

In submitting invoices for work performed for an agreed-upon fixed price, Service Provider shall abide by the guidelines set forth on Exhibit D, as Safeway may, from time to time, alter such guidelines.

**5.2     Purchasing Card Payment.**

Service Provider is required to participate in Safeway's Straight-Through processing program, and receive payment via a Safeway supplied Purchasing Card subject to the following requirements:

A)     In order to use a Safeway Supplied **Purchasing Card** to accept payment for goods and services, Service Provider must be able to pass the "**Job Authorization Number**" along with cost information to the credit card company.  This is commonly referred to as "Level Two" service with your credit card company.

B)     Service Provider must be able to bill all work originating from RFSC by Purchasing Card.

C)     Purchasing Card procedures for "Out-of-Contract Work":

1.     When "Out-of-Contract work" is completed, costing information must be completed on the WON, and the original signed and stamped Service Provider service ticket must be faxed for attachment to the Work Order using WON.

2.     Illegible documents will be returned to Service Provider and may not be used for documenting invoices for services rendered.

3.     Payment for work that has not been designated as "Completed" the WON will not be made until the Service Provider has updated the Work Order on line.

4.     After (a) Safeway and Service Provider agree that the work has been completed, (b) signed service documents are received by Safeway, and (c) the approved amount matches the invoiced amount, a randomly generated "**Job Authorization Number**" will be issued to Service Provider by Safeway by fax or e-mail.

5.     The entire authorization number is a requirement for payment of service charges using the Purchasing Card.

**5.3     Invoice Payment Terms.**  Unless otherwise agreed in writing between Safeway and Service Provider, invoice payment terms will be net thirty (30) days from Safeway's receipt of such invoice.  Safeway reserves the right to revise the invoicing and payment procedures by written notice to Service Provider.  Service Provider shall submit invoices for all work hereunder within sixty (60) days after completion of such work, and hereby

CW052215PFC.02

waives payment with respect to work not so invoiced. Included services shall be invoiced according to the guidelines set forth on Exhibit D hereto.

**ARTICLE VI—On-Demand Services that are not included in the fixed contract pricing.**

A)    If all or any part of work provided by Service Provider is to be performed on a time and material or cost-plus basis, the following provisions shall apply:

        1.    Labor supplied by Service Provider shall be charged to Safeway only at the rates established in Exhibit B.

        2.    Materials shall be charged to Safeway only at rates established in writing between Safeway and Service Provider.

        3.    Properly prepared and certified time sheets or service tickets that have been signed by the store person in charge shall substantiate all labor charges.

        4.    Material not from inventory and equipment rental charges shall be substantiated, to Safeway's reasonably satisfaction, by copies of paid invoices and/or receipts.

B)    If Service Provider anticipates, at any time, that work will exceed the spending limit set by Safeway, as printed on Safeway's work order, Service Provider will immediately access the WON and (i) update the status of the work Order to "Needs Attention" (ii) select the needs estimate status, (iii) provide sufficient detail for Division Floor Care Manager to determine whether the work should be continued, and (iv) notify the Division Floor Care Manager, in person, by phone or by e-mail, of the "Needs Attention" status.

C)    Upon completion of requested work, Service Provider will present Service Provider's service ticket to Safeway's PIC for a store stamp and a signature. The store stamp and signature from the PIC will indicate that the work has been completed to the satisfaction of the store PIC. Safeway's Division Floor Care Manager has final approval rights and may still challenge the work completed.

D)    The following information is required to be clearly stated on Service Provider's service ticket before Safeway's PIC is asked to provide a store stamp and signature for the work:

        1.    A clear and concise description of the work completed

        2.    Details the hours worked clearly indicating start and finish time

        3.    Details on the materials used

**ARTICLE VII—Receiving and Completing Work Orders**

A) Service Provider will use Safeway's web-enabled software, the Corrigo Work Order Network,(WON), for managing service calls. Service Provider shall be responsible for, and shall pay, all fees required to access the Corrigo Work Order Network. Corrigo will maintain a web site as the main point of communications with Service Provider, referred to as the WON. Service Provider will access the WON to receive service assignments, and will choose among the following options:

    1. *"Accept"* which means the Service Provider accepts the work Order and will attempt to complete the requested work

    2. *"Needs Attention"* which means that the Service Provider is unable to complete the service call or needs approval for an estimate. Service Provider will select a reason from the list provided by the software and provide sufficient explanation to justify the delay.

    3. *"Completed"* which means that the work is finished. Service Provider will update costing and labor information using the WON

B) The initial Work Order sent to Service Provider via fax or e-mail must indicate a status of *"New"* in the Work Order Details section which means it is waiting for Service Provider to access the WON and *"Accept"* the call.

C) Once a call is accepted by Service Provider, the status of the call is changed to *"Open"* which means Service Provider has accepted the call and will perform the requested work.

D) Except in the case of an after-hours emergency, Service Provider will not respond to a service call without first accessing the Safeway's WON and accepting the call.

E) In the event of an emergency, Safeway may call Service Provider to initiate a service and send the Work Order form that contains the Work Order Number at a later time.

F) If Service Provider is unable, for any reason, to complete the work assigned, Service Provider shall immediately access the WON and update the status of the call to **"Needs Attention"** and then select the reason from the list offered. Contractor must enter comments sufficient to explain the reason for not completing the work.

G) Service Provider acknowledges and agrees that Safeway shall not be required to pay or reimburse Service Provider for, and Service Provider prospectively waives any claim for, work that is not completed, and marked as "Complete" in the WON, within sixty (60) days (or such shorter period as may be indicated in the Work Order) after acceptance by Service Provider.

### ARTICLE VIII—General Terms

**8.1     No Agency**

Safeway and Service Provider shall be independent contractors hereunder, and this Agreement shall not be construed to create any other relationship between the parties, whether as partners, as principal and agent, as joint ventures, or otherwise. Neither party is authorized to enter into Agreements for or on behalf of the other party, to collect any obligation due or owed to the other party, to accept service of process for the other party, or to bind the other party in any manner whatever.

Safeway shall not control, direct, or supervise Service Provider personnel or permitted subcontractors whose use has been approved by Safeway and engaged by the Service Provider.

All personnel of the Service Provider performing services under this Agreement shall be employees of the Service Provider or its agent and not employees of Safeway. Safeway shall have no right to hire, transfer, layoff, promote, suspend, discipline, and discharge any of its employees working at Safeway's location. Service Provider agrees to comply with all applicable Federal, State, and Municipal laws regarding compensation and conditions of employment for employees of Service Provider who perform services pursuant to this Agreement.  Service Provider further agrees to require that any permitted sub-contractor that Service Provider may retain to perform services pursuant to this Agreement will agree to comply with all applicable Federal, State, and Municipal laws regarding compensation and conditions of employment.

Service Provider assumes full and sole responsibility for the payment of all compensation and expenses for its personnel, and shall withhold and pay all applicable State and Federal employment taxes, including, without limitation, self-employment taxes, unemployment insurance taxes, Federal income tax withholding, disability insurance and Social Security taxes (collectively "Employment Taxes").  Upon request of Safeway, Service Provider or its agent shall provide Safeway with documentation Safeway deems necessary to establish that Service Provider has paid all compensation required by law for the services provided and has properly withheld and/or paid all employment taxes in accordance with the applicable laws.

Safeway shall have no obligation to provide Service Provider or its employees, permitted subcontractors or agents with any employee benefits now, or hereafter, established for employees of Safeway.  Employees, permitted subcontractors, and agents of Service Provider shall have no right to contribute to any of Safeway's benefit plans now, or hereafter, established for employees of Safeway.

Before requesting payment from Safeway, Service Provider shall pay in full all Service Provider's employees performing the work, all material suppliers furnishing materials, and all permitted subcontractors employed by Service Provider.  Safeway may require as a condition of payment that Service Provider furnish evidence satisfactory to Safeway that all Service Provider's employees performing work, all material suppliers furnishing materials, and all permitted subcontractors employed by Service Provider have been paid in full and have released any lien rights.

## 8.2   Confidential Information

Each party hereto, as "Receiver," acknowledges that, in the course of performing this Agreement, it shall receive or have revealed to it information ("Confidential Information") of the other party ("Discloser") that Discloser deems confidential and/or proprietary, and further acknowledges that Discloser derives substantial value from the confidentiality of such information.

Each party, as Receiver, agrees to apply, during the term of this Agreement and for not less than five (5) years thereafter, reasonable efforts to prevent the disclosure of Confidential Information of Discloser, which efforts shall in no event be less than either (i) measures it applies to protect its own information of a similar nature or (ii) measures required by any and all applicable law. Receiver further agrees to disclose Discloser's Confidential Information only to its employees who (i) require such information to perform this Agreement, and (ii) are bound by obligations of confidentiality, including written confidentiality agreements, substantially the same as the obligations set forth in this Section 8.2.  Receiver further agrees to use Discloser's Confidential Information, and to cause its employees to use Discloser's Confidential Information, solely for purposes of performing this Agreement and the transactions contemplated hereunder.

Confidential Information may include, but shall not be limited to, customer information, processes, methods, locations, sales data, financial information, confidential compilations of publicly available information, or other sensitive data, but shall not include information that Receiver can prove, bearing the burdens of production and persuasion, (i) is or becomes, through no fault of Receiver, part of the public domain; (ii) was already known to Receiver at the time of disclosure; (iii) was independently developed by Receiver without reference to or use of information received from Discloser; or (iv) is lawfully disclosed to Receiver by a third party without obligation as to confidentiality.  Information regarding customers and/or consumers shall be deemed confidential, notwithstanding any of the foregoing exceptions, to the full extent required by any and all applicable laws, rules, regulations, and court orders.

Receiver acknowledges that all information of Discloser shall be and remain the property of Discloser. Receiver shall return to Discloser all documents received from Discloser promptly after a request by Discloser. The parties acknowledge that monetary damages would provide an inadequate remedy for breach of this Section 8.2, and therefore agree that, in the event of such breach, the non-breaching party shall be entitled to equitable relief, including injunction, in addition to such remedies as may be available at law.

In the event that Receiver is required, by order, subpoena or otherwise, by a government authority having such power, to disclose Discloser's Confidential Information, then Receiver shall:  (i) notify Discloser of the prospective disclosure as soon as practicable, (ii) cooperate with Discloser, as appropriate, in seeking such protective orders or relief from such disclosure as may be available and (iii) maintain the confidentiality of such Confidential Information in accordance with the terms hereof to the fullest extent practicable under the circumstances.  Disclosure in accordance with this paragraph shall not, by itself, vitiate the status of such information as Confidential Information.

### 8.3     Publicity

Service Provider shall not use Safeway or its Affiliates' names or any language, pictures, trademarks, service marks or symbols which could, in Safeway judgment, imply Safeway or its Affiliates' identity or endorsement by Safeway, its Affiliates or any of its employees in any (i) written, electronic, or oral advertising or presentation or (ii) brochure, newsletter, book, electronic database, or other written material of whatever nature, without Safeway's prior written consent (hereafter the terms in these Subsections (i) and (ii) above shall be collectively referred to as "Publicity Matters"). Service Provider will submit to Safeway for written approval, prior to publication, all publicity matters that mention or display Safeway or its Affiliates' names, trademarks or service marks or that contain any symbols, pictures or language from which a connection to said names or marks may be inferred or implied.

### 8.4     Licenses and Patents

No licenses express or implied, under any patents, copyrights, trademarks or other intellectual property rights are granted by Safeway to Service Provider under this Agreement.

### 8.5     *Force Majeure*

If either party's performance is prevented, hindered or delayed by reason of cause(s) beyond such party's reasonable control, and which cannot be overcome by reasonable diligence, including war, labor disputes (including strikes and lockouts), civil disorders, governmental acts, epidemics, quarantines, embargoes, fires, earthquakes, storms, or acts of God ("*Force Majeure*"), then, provided such party gives prompt notice to the other party of the occurrence of the *Force Majeure* event, such party shall be excused from performance (other than payment obligations hereunder, which must be paid when due, regardless of the occurrence of any *Force Majeure*) to the extent that it is prevented, hindered or delayed thereby during the continuance of such cause(s) and for so long as, and to the extent that, such cause(s) prevent or delay performance hereunder; provided that in the event that Service Provider's performance is materially excused under this Section 8.5 for a period of ninety (90) days or more, or which is reasonably expected to equal or exceed such ninety (90) day period, Safeway shall have the option, in its sole discretion, of terminating this Agreement in accordance with Section 1.6.

CW052215PFC.02

**8.6    Notices**

Any notice required or permitted hereunder shall be given by personal delivery, overnight delivery, or prepaid registered or certified mail (return receipt requested), addressed as follows:

If to Service Provider:

Premier Floor Care, Inc.
2248 Meridan Boulevard, Suite H
Minden, NV  89423
Attn:  Cedric Moore

If to Safeway:

Safeway, Inc.
250 Parkcenter Blvd.
Boise, ID  83706
Attn:  Legal Department

                    With copies to:

Safeway, Inc.
5918 Stoneridge Mall Road
Pleasanton, CA  94588
Attn:  Director of Strategic Sourcing - GNFR

Or to such other addresses as either party may designate by written notice.  Notice delivered in the foregoing manner shall be effective upon receipt by the addressee or upon first attempted delivery if such delivery is refused or intentionally frustrated by the addressee.

**8.7      Construction and Interpretation**

a.  The Parties agree that this Agreement has been prepared jointly and has been the subject of arm's length negotiation. Each Party has been given the opportunity to independently review this Agreement with legal counsel and other consultants, and each Party has the requisite experience and sophistication to understand, interpret and agree to the particular language of the provisions. Accordingly, in the event of an ambiguity in or dispute regarding the interpretation of this Agreement, the drafting of the language of this Agreement shall not be attributed to either Party.

b.  Except as otherwise specified, Service Provider's price for Services includes the price for all related goods or services necessary for Safeway to use the Services and/or Services for its intended purpose, as well as all other Service Provider obligations under this Agreement. Services and Software shall be treated as "goods" for purposes of applying the Uniform Commercial Code ("UCC"). If there is an inconsistency or conflict between the terms of this Agreement and an Order, the terms in the Order shall control with respect to Product description, price, quantity, "ship-to" location, and shipping terms, but shall not alter or modify this Agreement in any other respect, and in all other respects this Agreement shall be controlling.

c.  Whenever any Party is entitled to interest under this Agreement, the amount of interest shall be twelve percent (12%) per annum or the highest amount allowed by the governing law, whichever is lower.

**8.8      Entire Agreement, Amendments**

This Agreement constitutes the entire agreement between the Parties with respect to its subject matter, and supersedes all prior agreements, representations, discussions, and negotiations, whether oral or written, with respect to such subject matter. This Agreement may not be amended, supplemented or modified in any respect without further written Agreement of both parties, signed by their respective authorized representatives (which, for purposes of Safeway, shall not include store employees). Form language of Service Provider's forms, such as invoices, bills of lading and the like, regardless of whether signed by Safeway's representative, may supplement, but shall not amend, modify, or supersede this Agreement.

**8.9      Waivers**

No failure to enforce any right hereunder shall be construed to be a waiver or relinquishment of such Party's right to such performance or other future performance of such term or terms or of any right hereunder. No waiver of any right accruing under this Agreement shall be effective unless set forth in a writing signed by an authorized representative of the Party bound thereby. A Party's consent to or approval of any act requiring such consent or approval shall not be deemed to render unnecessary the obtaining of such consent or approval of any subsequent act.

**8.10     Jurisdiction and Applicable Law**

This Agreement shall be governed by and construed in accordance with the law of the State of California, without regard to the conflict of laws principals thereof. For purposes of any court proceeding referred arising under this Agreement, the parties hereby irrevocably agree and consent to the personal jurisdiction and venue of the state and federal courts located in Alameda County, California, U.S.A. and any objection to the jurisdiction or venue of any such court is hereby waived. The prevailing party in any arbitration or court action or proceeding shall be awarded its reasonable attorneys' fees and costs and reasonable expert witness fees.

CW052215PFC.02

**8.11    Assignment**

Neither Party may assign this Agreement or any of its rights or obligations hereunder, and no attempted assignment shall be effective, without the other Party's consent; provided, however, that a change in control of Safeway (whether through merger, sale of all or substantially all of the business and assets, initial public offering, sale of stock or otherwise) will not be deemed to be an assignment hereunder, and provided further that Service Provider hereby consents to assignment of this Agreement to any wholly owned parent, subsidiary, or Affiliate of Safeway.

**8.12    Severability**

In the event that any term or provision of this Agreement is held by a court having competent jurisdiction to be invalid or unenforceable, such term or provision shall be deemed severable to the extent required by such ruling, and the remainder of this Agreement shall remain in full force and effect.

**8.13    Counterparts**

This Agreement may be executed in one or more counterparts, which shall together constitute but one Agreement.

**ARTICLE IX—Definitions**

The following terms, when capitalized in this Agreement, shall have the meanings ascribed to them in this Article IX.

**9.1**      **"Affiliate"** means (1) a company, whether incorporated or not, which owns, directly or indirectly, a majority interest in either Party (a "parent company"), and (2) a company, whether incorporated or not, in which a five percent (5%) or greater interest is owned, either directly or indirectly, by: (i) either Party or (ii) a parent company.

**9.2**      **"Claims"** shall have the meaning indicated in Section 4.1, above.

**9.3**      **"Order"** means such purchase orders, work orders, forms, memoranda or other written communications as may be delivered to Service Provider for the purpose of ordering Product and Services hereunder.

**9.4**      **"Service(s)"** means any and all labor or service provided in connection with this Agreement or an applicable Order, including, but not limited to, consultation, engineering, installation, removal, maintenance, training, technical support, repair and programming.

**9.5**      **"Specifications"** means (i) Service Provider's applicable specifications and descriptions, including any warranty statements, and (ii) Safeway requirements, specifications, and descriptions specified in, or attached to, this Agreement or an applicable Order, which shall control over an inconsistency with Service Provider's specifications and descriptions.

CW052215PFC.02

**9.6** **"PIC"** refers to the person who is in charge of store operations at the time Service Provider is in Safeway's building. Persons In Charge include but are not limited to Store Manager, Co-Manager, Assistant Manager, Store Stocking Supervisor, etc.

**9.7** **"in-contract-work"** or PMRM (Preventative Maintenance and Routine Maintenance), means all work and services that are included or contemplated in the fixed monthly payment.

**9.8** **"out-of-contract work"** and **"On Demand"** means work that is requested by Safeway that is not included or contemplated in the fixed monthly payment.

**9.9** **"Special Services"** means stripping and refinishing or scrubbing and refinishing

**9.10** **"Division Floor Care Manager"** means the person responsible to oversee relations with the Service Provider for that division.

**9.11** **"RFSC"** means Retail Facility Service Center. RFSC is Safeway's call and invoice processing center currently located in Phoenix.

**9.12** **"Corrigo"** is the name of the computer-based maintenance work order system

**9.13** **"Work Order Network"** or **"WON"** means the name of the web based application hosted by Corrigo that will serve as the portal to access Safeway's work orders and to update information required to access, modify, enter financials, or complete Safeway's Corrigo generated work orders.

**9.14** **"Hazardous Communication Program"** is a specific program developed by the Safeway to make sure situations that involve the use of chemicals are handled in manner that meets Safeway's needs.

**IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives, below.**

| | | | |
|---|---|---|---|
| Safeway: | SAFEWAY, INC. | Service Provider: | Premier Floor Care, Inc. |
| Signed By: | | Signed By: | |
| Printed Name: | Tom Schwilke | Printed Name: | CEDRIC MOORE |
| Title: | Division President | Title: | CEO |
| Date: | 4 5 15 | Date: | 5/29/15 |

CW052215PFC.02

# EXHIBIT A

# SCOPE OF SERVICES

### General Requirements

1.  Service Provider shall obtain and maintain sufficient "Trailblazer®" and ProSpeed floor finish equipment, and such other equipment as may be appropriate, to perform its work hereunder. It is expected that you will have a minimum of one (1) Trailblazer® unit per eight (8) stores and one (1) ProSpeed unit per four (4) stores. Safeway will provide finishing replacement kits (which must be replaced after each use), pads, and supplies in order to comply with the Safeway floor care program.

2.  Safeway will supply all Diversey chemicals, authorized pads, dust mops, buckets, handles, squeegees, and Trailblazer finishing replacement kits (which must be replaced after each use). Authorized buffing pads supplied are 20" and 27".

3.  Propane Buffers:

    *   Under no circumstances will Service Provider store any propane tanks inside Safeway premises, including tanks attached to burnishing equipment.
    *   Service Provider will remove propane tanks when not in use.
    *   Service Provider is responsible for providing propane tanks, refills, and propane cages for outside storage if approved by Safeway, and must be in compliance with the Propane Powered Burnishing Operations as stated in Appendix I.
    *   All propane powered equipment must meet all applicable OSHA, air quality carbon monoxide and noise requirements for the community and the premises in which they are used.
    *   All propane powered equipment shall be equipped with a vacuum dust capturing system and carbon monoxide detector hang tag.

4.  Service Provider agrees to allow Safeway employees use of Service Provider's equipment on all indoor areas of the store, provided that Safeway shall use such equipment only in accordance with Supplier's reasonable instructions, and shall not use equipment outside of the stores (e.g. fuel centers, sidewalks, parking lots, or loading docks), and Safeway shall pay Service Provider $110.00 per period for each store at which Safeway uses the equipment. In addition, Safeway will identify the store locations and store employees authorized to use equipment, and Service Provider will be responsible for training authorized Safeway employees on proper use of equipment.

5.  At all times during the progress of service, all service technicians are required to maintain the area in which he/she is working in an orderly condition, free from any debris resulting from the execution of service (i.e. empty fluid containers, parts' boxes, old batteries, etc.).

6.  Service Provider will assure that work being performed will not adversely affect food safety. If Services are to be performed in a food production area, Service Provider will not perform such service until such time as the store has taken reasonable precautions to protect the food from contamination.  **At no time will a Service Provider use drain cleaning equipment in a space where food production is underway or food is left exposed and uncovered.**

7.  Service Provider agrees to use caution signs and barriers, as appropriate, when performing its work in a store.

8.  Service Provider agrees that its employees and agents will not use store drains or floor drains to discard wax, any material that might clog such drains, food items, or any hazardous substance.

9.  Service Provider agrees that its employees and agents will return all floor mats to their original location and placement position after all floor cleaning.

10. Service Provider will not park service vehicles within one hundred twenty (120) feet of any store's front doors during store business hours except as necessary for heavy items or truck mounted equipment, and, in such exceptional cases, will promptly move such service vehicles after such placement is no longer necessary.


**Basic Scope of Daily Services**

Service Provider shall, on a daily basis (unless otherwise specified below), perform the following at each store covered hereunder:

1.  **Autoscrub** all exposed resilient tile surfaces that are accessible to the scrubber
2.  **Hand Mop** all exposed resilient tile surfaces that are not accessible to the scrubber
3.  **Sweep Sales Floor** of all loose dirt, dust, and debris.  Broom sweep around mats, counters, shelving, and other obstructions. Clean out all floor drains.
4.  **Autoscrub** planking style resilient tile if present (no finish or buffing are allowed on planking).
5.  **Dust Mop Entire Floor** using an untreated dust mop.  Remove all gum and stickers and sweep under the Pharmacy and Meat counter bumpers, and ensure edges & corners are free of dirt and debris.
6.  **Deep Scrub & Recoat (DSR)** store areas at the frequencies indicated in Exhibit B.
7.  **Strip & Reapply Sealer and Finishes** in the store areas at the frequency of one (1) time per year.
8.  **Propane Burnishing** 3x per week in all stores, and shall burnish the 1st day after a day off for all stores that are not on a 7-day frequency of daily services:
9.  **Clean Employee Break Room Floors** once per week.  Broom sweep all floors and stairs and mop all floor areas.
10. **Vacuum Entrance Carpet**.  Spot clean and remove gum.
11. **Clean Public Restrooms Daily**.  Sweep, mop, clean and sanitize public restrooms. (Clean urinals, toilets, sinks, fixtures, mirrors, adjacent wall and partitioned areas and stock all "Safeway supplied" paper products).

12. **Clean Employee Restrooms**. Sweep, mop, clean and sanitize employee restrooms <u>3 times per week.</u> (Clean urinals, toilets, sinks, fixtures, mirrors, adjacent wall and partitioned areas and stock all "Safeway supplied" paper products).

13. **Janitorial Room Maintenance**. Organize products, remove all trash and debris, clean down sink area.

14. **Deep Scrub and Strip** the following areas at the frequencies indicated in Exhibit B:

      **a.** Front Lobby and Front Aisle
      **b.** Produce/Floral Department
      **c.** Back Aisle
      **d.** Deli Food Service Area
      **e.** Beverage Aisle
      **f.** Groupings of three grocery aisle

## On Demand Services - Not included in the cost for Basic Scope of Daily Services.

The following services will require prior approval from the Division Floor Care Manager and will be priced and billed separately according to the procedures defined in the Master Floor Care Agreement.

1.  **Out of Contract Deep Scrub and Recoat.** Deep Scrub floors and apply two coats of floor finish in a specified store area using the Diversey specified process and chemicals. This is for work that is not included in the fixed price contract. Out of contract deep scrub and recoat labor is to be priced per square foot.
2.  **Out of Contract Strip and Refinish** completely strip off existing finishes and apply sealer and finish according to Diversey's specified process and amounts in a specified store area using the Diversey specified process and chemicals. This is for work that is not included in the fixed price contract. Out of contract deep strip and refinish labor is to be priced per square foot
3.  **Carpet Deep Cleaning and Extraction:** Vacuum, spot treat, extract and dry carpets. This does not include movable walk off mats. Carpet Deep Cleaning and Extraction is to be priced per event.
4.  **Deep Restroom Cleaning** Clean ceiling and floor drains, machine scrub floors, dust air vents and exhaust fan covers, wash walls, clean partitions. Deep restroom cleaning is to be priced per event.
5.  **Deep Break Room Cleaning** strip & finish floors. Priced per event.
6.  **Restroom Graffiti Removal** (Safeway to supply graffiti removal products). Priced per hour.
7.  **Offices** Vacuuming and spotting carpets, sweep and mop floors. Priced per event.
8.  **Backroom Sweep** Dust mop and pick up small loose debris on accessible areas only. BSC is not required to move freight to access the floor. Priced per event.
9.  **Backroom Sweep and Scrub** accessible areas. BSC is not required to move freight to access the floor. Priced per event.
10. **Backroom Concrete Floors Sealing or Waxing** (only in accessible areas. BSC is not required to move freight to access the floor). Labor for backroom sealing or waxing is priced per event.
11. **Meat/Seafood Department** Sweep the floors, using the approved sanitizing system, and clean out drain screens in the floor sinks. Priced per event.
12. **Coffee/Jamba Juice Kiosks** Sweep and mop the floors, and clean out drain screens in the floor sinks. Priced per event.
13. **Reach in Doors Glass Cleaning on Refrigerated Cases.** Priced per case door, inside and out.
14. **Half Shift 4-hour Porter Service** which would include one person to perform periodic sweeping and spot mopping of the sales and spot cleaning of rest rooms including wiping off countertops, baby changing stations, table tops, seating, toilets and urinals. Priced per shift
15. **Full Shift 8-hour Porter** which would include one person to perform a periodic sweeping and spot mopping of the sales floor and periodic spot cleaning of the public and employee restrooms including wiping off countertops, baby changing stations, table tops, seating, toilets and urinals. Priced per shift
16. **Deep Scrubbing of Produce Area** dust mopping the entire area, then using soft deep scrubbing brushes (no pads) while making two passes over the entire produce area with double the cleaner in the solution tank. The second pass should be at half or 50% the rate of the normal daily scrubbing speed to give the necessary agitation to the produce planking flooring. Pricing is per event.

CW052215PFC.02

# EXHIBIT B
# PRICING, LOCATIONS AND FREQUENCY

## Pricing

| | | Basic Scope of Daily Services Price Per Cleanable SqFt, Per Event | | | |
|---|---|---|---|---|---|
| Division Number | District Number | Daily Cleaning | Deep Scrub & Recoating | Strip & Refinish | Burnish |
| NOR | 2 | $0.0111 | $0.0600 | $0.1000 | $0.0037 |
| NOR | 4 | $0.0100 | $0.0350 | $0.0700 | $0.0037 |
| NOR | 7 | $0.0102 | $0.0600 | $0.0800 | $0.0037 |
| NOR | 10 | $0.0102 | $0.0350 | $0.0700 | $0.0037 |

## On-Demand Pricing

| District Number | Restroom Deep Cleaning | Carpet Extraction | Deep Scrub & Recoat | Strip & Refinish | Break Room Deep Cleaning | Graffiti Removal |
|---|---|---|---|---|---|---|
| | Cost Per Restroom | Price Per Event | Price Per Cleanable SqFt Per Event (Same as for Basic Scope of Services) | | Price Per Event | Price Per Hour |
| ALL | $115.00 | $135.00 | | | $115.00 | $25.00 |
| District Number | Offices (Strip & Refinish) | Backroom Sweep | Backroom Sweep and Scrub | Bakery Prep | Deli/Food Service & Kitchen Floors | Coffee/Jamba Juice Kiosks |
| | Price Per Event | Price Per Event | Price Per Event | Price Per Event | Price Per Event | Price Per Event |
| ALL | $100.00 | $52.00 | $90.00 | $115.00 | $115.00 | $30.00 |
| District Number | Reach in Doors Glass Cleaning on Refrigerated Cases | | Half Shift 4-Hour Porter Service | | Full Shift 8-Hour Porter Service | Deep Scrub Produce Area |
| | Price Per Case Door (inside and out) | | Price Per Shift | | Price Per Shift | Price Per Event |
| ALL | $2.50 | | $120.00 | | $240.00 | $75.00 |

## Fuel Center – Deep Scrub & Recoat

| Norcal Fuel Center – Deep Scrub & Recoat | | | | |
|---|---|---|---|---|
| Store | District | Estimated Cleanable SqFt. | Frequency of Service | Deep Scrub & Recoat Price Per Event |
| 1257 | 7 | 300 | Quarterly | $50.00 |
| 1953 | 7 | 300 | Quarterly | $50.00 |
| 2856 | 7 | 650 | Quarterly | $65.00 |
| 2712 | 7 | 850 | Monthly | $75.00 |
| 2856 | 7 | 650 | Monthly | $65.00 |

CW052215PFC.02

## Store Locations

| District # | Store # | Street Address | City | State | Zip |
|---|---|---|---|---|---|
| 2 | 0653 | 700 B ST | SAN RAFAEL | CA | 94901 |
| 2 | 0774 | 50 SOLANO SQUARE | BENICIA | CA | 94510 |
| 2 | 0788 | 1 CAMINO ALTO | MILL VALLEY | CA | 94941 |
| 2 | 0911 | 477 W NAPPA ST | SONOMA | CA | 95476 |
| 2 | 0913 | 1620 CLAY ST | NAPA | CA | 94559 |
| 2 | 0918 | 6340 COMMERCE BLVD | ROHNERT PARK | CA | 94928 |
| 2 | 0932 | 950 LAS GALLINAS | SAN RAFAEL | CA | 94903 |
| 2 | 0968 | 709 LINCOLN ROAD W | VALLEJO | CA | 94590 |
| 2 | 0979 | 900 DIABLO AVE | NOVATO | CA | 94947 |
| 2 | 0989 | 774 ADM CALLAGHAN LANE | VALLEJO | CA | 94591 |
| 2 | 1631 | 122 ROBLES DR. | VALLEJO | CA | 94591 |
| 2 | 1723 | 838 SIR FRANCIS DRAKE | SAN ANSELMO | CA | 94960 |
| 2 | 1883 | 103 AMERICAN CANYON RD. | AMERICAN CANYON | CA | 94503 |
| 2 | 2318 | 137 CORTE MADERA TOWN CTR | CORTE MADERA | CA | 94925 |
| 2 | 2449 | 3375 JEFFERSON STREET | NAPA | CA | 94558 |
| 2 | 2605 | 1026 HUNT AVENUE | ST. HELENA | CA | 94574 |
| 2 | 2718 | 110 STRAWBERRY VILLAGE B100 | MILL VALLEY | CA | 94941 |
| 2 | 2828 | 5720 NAVE DRIVE | NOVATO | CA | 94949 |
| 2 | 3011 | 389 SOUTH MCDOWELL ROAD | PETALUMA | CA | 94954 |
| 4 | 0638 | 4100 REDWOOD RD | OAKLAND | CA | 94619 |
| 4 | 0654 | 2096 MOUNTAIN BLVD | OAKLAND | CA | 94611 |
| 4 | 0669 | 5130 BROADWAY | OAKLAND | CA | 94611 |
| 4 | 0676 | 1500 SOLANO AVE | ALBANY | CA | 94706 |
| 4 | 0691 | 1444 SHATTUCK PLACE | BERKELEY | CA | 94709 |
| 4 | 0790 | 555 BANCROFT AVE | SAN LEANDRO | CA | 94577 |
| 4 | 0908 | 3550 FRUITVALE AVE | OAKLAND | CA | 94602 |
| 4 | 0951 | 867 ISLAND DRIVE | ALAMEDA | CA | 94502 |
| 4 | 0976 | 605 PARKER BLDG A | RODEO | CA | 94572 |
| 4 | 0994 | 1499 WASHINGTON AVE | SAN LEANDRO | CA | 94577 |
| 4 | 1119 | 3747 GRAND AVE. | OAKLAND | CA | 94610 |
| 4 | 1714 | 1421 TARA HILL DR | PINOLE | CA | 94564 |
| 4 | 2708 | 2227 S SHORE CENTER | ALAMEDA | CA | 94501 |
| 4 | 2870 | 6310 College Ave | OAKLAND | CA | 94618 |
| 4 | 2940 | 11450 SAN PABLO AVE | EL CERRITO | CA | 94530 |
| 4 | 3125 | 3889 SAN PABLO AVE | EMERYVILLE | CA | 94608 |
| 4 | 3281 | 2600 5th Street | ALAMEDA | CA | 94501 |
| 7 | 0697 | 1972 TICE VALLEY BLVD | WALNUT CREEK | CA | 94595 |
| 7 | 0783 | 3540 MT DIABLO BLVD | LAFAYETTE | CA | 94549 |
| 7 | 0910 | 1554 FIRST ST | LIVERMORE | CA | 94550 |
| 7 | 0917 | 600 S BROADWAY | WALNUT CREEK | CA | 94596 |
| 7 | 0936 | 710 BANCROFT RD. | WALNUT CREEK | CA | 94598 |

| District # | Store # | Street Address | | City | State | Zip |
|---|---|---|---|---|---|---|
| 7 | 0939 | 3334 ALHAMBRA AVE | | MARTINEZ | CA | 94553 |
| 7 | 0962 | 200 ALAMO PLAZA | | ALAMO | CA | 94507 |
| 7 | 0967 | 2 CAMINO SOBRANTE | | ORINDA | CA | 94563 |
| 7 | 0969 | 1355 MORAGA WAY | | MORAGA | CA | 94556 |
| 7 | 0972 | 6688 ALHAMBRA | | MARTINEZ | CA | 94553 |
| 7 | 0982 | 2505 SAN RAMON VALLE | | SAN RAMON | CA | 94583 |
| 7 | 1211 | 3496 CAMINO TASSAJARA | | DANVILLE | CA | 94506 |
| 7 | 1257 | 4495 FIRST ST | | LIVERMORE | CA | 94551 |
| 7 | 1502 | 1701 SANTA RITA RD | | PLEASANTON | CA | 94566 |
| 7 | 1541 | 1978 CONTRA COSTA BLVD | | PLEASANT HILL | CA | 94523 |
| 7 | 1701 | 2941 YGNACIO VALLEY | | WALNUT CREEK | CA | 94598 |
| 7 | 1932 | 4440 TASSAJARA RD | | DUBLIN | CA | 94568 |
| 7 | 1953 | 7499 DUBLIN BLVD | | DUBLIN | CA | 94568 |
| 7 | 2712 | 11050 BOLLINGER CANYON ROAD | | SAN RAMON | CA | 94582 |
| 7 | 2856 | 6790 BERNAL AVE | | PLEASANTON | CA | 94566 |
| 7 | 2941 | 707 CONTRA COSTA BLVD | | PLEASANT HILL | CA | 94520 |
| 10 | 0928 | 600 PATTERSON BLVD | | PLEASANT HILL | CA | 94523 |
| 10 | 0955 | 2600 WILLOW PASS ROAD | | CONCORD | CA | 94519 |
| 10 | 1192 | 4309 CLAYTON RD | | CONCORD | CA | 94521 |
| 10 | 1195 | 5431 CLAYTON RD | | CLAYTON | CA | 94517 |
| 10 | 1215 | 660 BAILEY ROAD | | W PITTSBURG | CA | 94565 |
| 10 | 1234 | 1125 SECOND ST | | BRENTWOOD | CA | 94513 |
| 10 | 1259 | 3365 DEER VALLE RD | | ANTIOCH | CA | 94531 |
| 10 | 1648 | 2449 WEST KETTLEMAN LANE | | LODI | CA | 95242 |
| 10 | 1661 | 2001 MCHENRY AVENUE, SUITE C | | MODESTO | CA | 95350 |
| 10 | 1769 | 2808 COUNTRY CLUB | | STOCKTON | CA | 95204 |
| 10 | 1917 | 14840 HIGHWAY 4 | | DISCOVERY BAY | CA | 94505 |
| 10 | 1968 | 3051 COUNTRYSIDE DRIVE | | TURLOCK | CA | 95380 |
| 10 | 2600 | 1801 WEST 11TH STREET | | TRACY | CA | 95377 |
| 10 | 2621 | 3110 BALFOUR ROAD | | BRENTWOOD | CA | 94513 |
| 10 | 2707 | 6445 PACIFIC AVENUE | | STOCKTON | CA | 95207 |
| 10 | 3121 | 2237 WEST CLEVELAND | | MADERA | CA | 93637 |
| 10 | 3124 | 1187 SOUTH MAIN ST | | MANTECA | CA | 95337 |
| 10 | 3127 | 1291 SANGUINETTI RD | | SONORA | CA | 95370 |

**Frequency of Services**

| Store # | Days of Service Per Week | Deep Scrubs Per Year | Strips Per Year | Burnishing times per week |
|---------|--------------------------|----------------------|-----------------|---------------------------|
| 0653 | 6 | 7 | 1 | 3 |
| 0774 | 6 | 7 | 1 | 3 |
| 0788 | 6 | 6 | 1 | 3 |
| 0911 | 6 | 7 | 1 | 3 |
| 0913 | 5 | 5 | 1 | 3 |
| 0918 | 6 | 7 | 1 | 3 |
| 0932 | 6 | 7 | 1 | 3 |
| 0968 | 6 | 7 | 1 | 3 |
| 0979 | 6 | 7 | 1 | 3 |
| 0989 | 6 | 7 | 1 | 3 |
| 1631 | 6 | 7 | 1 | 3 |
| 1723 | 6 | 6 | 1 | 3 |
| 1883 | 6 | 7 | 1 | 3 |
| 2318 | 6 | 7 | 1 | 3 |
| 2449 | 6 | 7 | 1 | 3 |
| 2605 | 6 | 7 | 1 | 3 |
| 2718 | 6 | 7 | 1 | 3 |
| 2828 | 7 | 7 | 1 | 3 |
| 3011 | 6 | 7 | 1 | 3 |
| 0638 | 5 | 6 | 1 | 3 |
| 0654 | 5 | 5 | 1 | 3 |
| 0669 | 6 | 7 | 1 | 3 |
| 0676 | 5 | 6 | 1 | 3 |
| 0691 | 5 | 6 | 1 | 3 |
| 0790 | 5 | 6 | 1 | 3 |
| 0908 | 6 | 7 | 1 | 3 |
| 0951 | 5 | 6 | 1 | 3 |
| 0976 | 5 | 5 | 1 | 3 |
| 0994 | 6 | 7 | 1 | 3 |
| 1119 | 5 | 6 | 1 | 3 |
| 1714 | 5 | 6 | 1 | 3 |
| 2708 | 7 | 7 | 1 | 3 |
| 2870 | 7 | 7 | 1 | 3 |
| 2940 | 6 | 7 | 1 | 3 |
| 3125 | 6 | 7 | 1 | 3 |
| 3281 | 7 | 7 | 1 | 3 |
| 0697 | 5 | 6 | 1 | 3 |
| 0783 | 6 | 7 | 1 | 3 |
| 0910 | 6 | 7 | 1 | 3 |
| 0917 | 6 | 7 | 1 | 3 |
| 0936 | 6 | 7 | 1 | 3 |
| 0939 | 5 | 5 | 1 | 3 |

CW052215PFC.02

| Store # | Days of Service Per Week | Deep Scrubs Per Year | Strips Per Year | Burnishing times per week |
|---|---|---|---|---|
| 0962 | 6 | 7 | 1 | 3 |
| 0967 | 6 | 6 | 1 | 3 |
| 0969 | 6 | 7 | 1 | 3 |
| 0972 | 6 | 7 | 1 | 3 |
| 0982 | 6 | 7 | 1 | 3 |
| 1211 | 6 | 7 | 1 | 3 |
| 1257 | 7 | 7 | 1 | 3 |
| 1502 | 6 | 7 | 1 | 3 |
| 1541 | 6 | 7 | 1 | 3 |
| 1701 | 5 | 6 | 1 | 3 |
| 1932 | 6 | 7 | 1 | 3 |
| 1953 | 7 | 7 | 1 | 3 |
| 2712 | 7 | 7 | 1 | 3 |
| 2856 | 6 | 7 | 1 | 3 |
| 2941 | 7 | 7 | 1 | 3 |
| 0928 | 5 | 6 | 1 | 3 |
| 0955 | 6 | 7 | 1 | 3 |
| 1192 | 6 | 7 | 1 | 3 |
| 1195 | 6 | 7 | 1 | 3 |
| 1215 | 6 | 7 | 1 | 3 |
| 1234 | 5 | 5 | 1 | 3 |
| 1259 | 6 | 7 | 1 | 3 |
| 1648 | 5 | 6 | 1 | 3 |
| 1661 | 6 | 7 | 1 | 3 |
| 1769 | 6 | 7 | 1 | 3 |
| 1917 | 6 | 7 | 1 | 3 |
| 1968 | 6 | 7 | 1 | 3 |
| 2600 | 7 | 7 | 1 | 3 |
| 2621 | 6 | 7 | 1 | 3 |
| 2707 | 7 | 7 | 1 | 3 |
| 3121 | 5 | 5 | 1 | 3 |
| 3124 | 5 | 6 | 1 | 3 |
| 3127 | 6 | 7 | 1 | 3 |

CW052215PFC.02

## Deep Scrub & Recoat Frequency

### Norcal
### Deep Scrub & Recoat (DSR) Frequency Per Period

| | | | | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LifeStyle A | | | Life Style A | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| LSA | Area 1 | Front Lobby, Front Aisle & Back Aisle | LSA Area 1 | 1 | 1 | | 1 | | 1 | | 1 | | 1 | 1 | | 1 | |
| LSA | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | LSA Area 2 | 1 | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | |
| LSA | Area 3 | All Other Center Aisles | LSA Area 3 | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | |
| LifeStyle A+ | | | Life Style A+ | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| LSA+ | Area 1 | Front Lobby, Front Aisle & Back Aisle | LSA+ Area 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| LSA+ | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | LSA+ Area 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| LSA+ | Area 3 | All Other Center Aisles | LSA+ Area 3 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| LifeStyle B | | | LifeStyle B | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| LSB | Area 1 | Front Lobby, Front Aisle & Back Aisle | LSB Area 1 | 1 | | | 1 | | 1 | | 1 | | 1 | 1 | | 1 | |
| LSB | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | LSB Area 2 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| LSB | Area 3 | All Other Center Aisles | LSB Area 3 | 1 | | | 1 | | | | 1 | | | | 1 | | |
| LifeStyle C | | | LifeStyle C | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| LSC | Area 1 | Front Lobby, Front Aisle & Back Aisle | LSC Area 1 | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | |
| LSC | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | LSC Area 2 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| LSC | Area 3 | All Other Center Aisles | LSC Area 3 | 1 | | | 1 | | | | 1 | | | | 1 | | |
| NON-LifeStyle A | | | NON-LifeStyle A | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| NLSA | Area 1 | Front Lobby, Front Aisle & Back Aisle | NLSA Area 1 | 1 | 1 | | 1 | | 1 | | 1 | | 1 | 1 | | 1 | |
| NLSA | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | NLSA Area 2 | 1 | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | |
| NLSA | Area 3 | All Other Center Aisles | NLSA Area 3 | 1 | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | |
| NLSA | Area 4 | Produce | NLSA Area 4 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| NON-LifeStyle B | | | NON-LifeStyle B | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| NLSB | Area 1 | Front Lobby, Front Aisle & Back Aisle | NLSB Area 1 | 1 | 1 | | 1 | | 1 | | 1 | | 1 | 1 | | 1 | |
| NLSB | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | NLSB Area 2 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| NLSB | Area 3 | All Other Center Aisles | NLSB Area 3 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| NLSB | Area 4 | Produce | NLSB Area 4 | 1 | | | 1 | | | | 1 | | | | 1 | | |
| NON-LifeStyle C | | | NON-LifeStyle C | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | P13 | To |
| NLSC | Area 1 | Front Lobby, Front Aisle & Back Aisle | NLSC Area 1 | 1 | | 1 | | 1 | | 1 | | | 1 | | 1 | | |
| NLSC | Area 2 | Deli, Bakery, Liquor, Beverage & Frozen | NLSC Area 2 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| NLSC | Area 3 | All Other Center Aisles | NLSC Area 3 | 1 | | | 1 | | | | 1 | | | 1 | | 1 | |
| NLSC | Area 4 | Produce | NLSC Area 4 | 1 | | | 1 | | | | 1 | | | | 1 | | |

CW052215PFC.02

# EXHIBIT C

# BUSINESS REQUIREMENTS – KEY PERFORMANCE INDICATORS

1. Service Provider agrees to be evaluated through Safeway's score card process and maintain performance score of:

    a.) 90% or better for IVR compliance, and shall only open a work order when the work is being started and shall not close the work order until the work has been fully completed. . Failure to do so may result in termination.

    b.) 80% or better for Store surveys. Failure to do so may result in termination.

    c.) Service provider shall burnish the 1st day after a day off for all stores that are not on a 7-day frequency of daily services. Failure to do so may result in termination.

2. If a work order is not marked as complete in the Corrigo system within 90 days after have been accepted, Service Provider waives any right to payment for such services.

3. Service Provider shall maintain 100% compliance in utilizing the "Trailblazer®" and ProSpeed floor finish equipment to perform its work as described in Exhibit B; Basic Scope of Daily Services. Failure to comply may result in a $100.00 fine per occurrence. Safeway will provide Service Provider sufficient proof of non-compliance prior to applying such fine.

# EXHIBIT D
## INVOICING REQUIREMENTS
## INCLUDED SERVICES

i. When performing included special services (deep scrubbing and or stripping floors) Service Provider will 'Complete' calls using the Corrigo WON (Work Order Network) upon job completion for the billing cycle. This information will populate the Summary Service Ticket to be taken to the stores and may result in a deduction if not shown as completed on the form.

ii. Service Provider is required to utilize the IVR system to log in and out for nightly cleaning and scheduled wet work.

iii. Service Provider will submit four week contract invoices according to Safeway's thirteen-period annual Calendar to Safeway's designated invoice processor.

iv. Service Provider will, as a condition precedent to payment hereunder, submit only one invoice per district for each four-week accounting period, which invoice shall (i) list all locations by store number and amount due, (ii) include a separate "summary service ticket" (on a form provided by Safeway), for each store serviced, attached in the sequence the stores are listed on the invoice.

v. Service Provider will comply with the following guidelines for all summary service tickets. Summary service tickets will include:

1. A box that will indicate if any days of service were missed or not completed satisfactorily on the nightly services. Missed or unsatisfactory days of service will be clearly indicated and deducted from the current four-week billing by Service Provider using the daily pricing included in the bid for services.

2. Spaces for any included Special Services that were ordered for that four-week period. Special services that were not completed to the Safeway's PIC's satisfaction will be clearly indicated and deducted from the current four-week billing. The value of the credit due is the pricing for services included in the bid for services.

3. A space for Safeway's store PIC signature and a space for a store stamp. Safeway will not accept a summary service ticket, other than an electronic service ticket, without the PIC signature and store stamp.

vi. When the Service Provider Contract Billing that has been properly documented has been received at Safeway's offices and is approved, a Corrigo Work Order will be created and emailed to the Service Provider. The amount of the Work Order will tie to the aggregate amount for all approved invoices for the districts serviced by the Service Provider in each of the Safeway's operating areas. This Work Order will contain the Authorization number to enter into the PCard transaction.

vii.  Invoices presented for payment that are incomplete, do not correctly give credits, are missing store summary service tickets, or are not signed and stamped by Safeway's PIC will be returned to the Service Provider for corrections.

viii.  For Special Services work performed that <u>is</u> included in the scope of the service contract, Service Provider will access Safeway's WON and complete the work order.  Failure to complete service tickets on line within 60 days of the due date for the Special Services work ordered without prior approval from Safeway will result in a credit taken for that service on the next regular billing.

Safeway reserves the right to revise the invoice and payment procedures by written notice to Service Provider.

Unless otherwise agreed to in writing between Safeway and Service Provider invoice payment terms will be 30 days from the receipt of an invoice not 30 days from the invoice date.

Service Provider will not submit invoices for service work that has taken place more than 90 days prior to the date the invoices are submitted without first receiving written approval from Safeway.  Safeway will not be required to pay for work that has not been invoiced and presented for payment to Safeway within at least 90 days from the time the work was completed unless prior approval has been granted by Safeway.