UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PREMIER FLOOR CARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALBERTSONS COMPANIES, INC., et al., <br><br> Defendants. | Case No. 21-cv-04188-EMC <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Docket No. 62 |

Plaintiff Premier Floor Care, Inc. has filed suit against Defendants Albertson Companies, Inc. and Safeway, Inc. (collectively, "Safeway") for civil conspiracy, breach of contract (including the implied covenant of good faith and fair dealing), and unfair competition. For many years, Safeway hired Premier to clean the floors in certain Safeway stores in Northern California. However, in early 2018, Safeway terminated its relationship with Premier. According to Premier, Safeway terminated the relationship based on pressure from a local union who wanted Safeway to use a different vendor instead – the company King Janitorial Equipment.[1] (Both Premier and King have unionized employees.) Now pending before the Court is Safeway's motion for summary judgment. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Safeway's motion.

**I.  FACTUAL & PROCEDURAL BACKGROUND**

Both parties have submitted evidence in conjunction with their briefing on summary

---

[1] Premier filed a separate lawsuit against the union. *See Premier Floor Care Inc. v. Service Employees Int'l Union*, No. C-18-1851 HSG (N.D. Cal.). That suit against the union settled in August 2019, before this case was filed.

judgment. That evidence reflects as follows.[2]

Premier is a company that provides floor care janitorial services. *See* FAC ¶ 1l; Premier 30(b)(6) Depo. at 31. Cedric Moore is the CEO of Premier and has held that position since approximately 2013. He has been with the company since its founding in 1999. *See* Moore ¶ 1.

Premier began working for Safeway in 2001, servicing over one hundred Safeway stores in Northern California. *See* Premier 30(b)(6) Depo. at 28-29; Moore Decl. ¶ 3. Every two to three years, Premier and Safeway would enter into a new agreement to govern their relationship, typically after Safeway requested proposals for bids for floor care services. *See* Premier 30(b)(6) Depo. at 37. During its time working for Safeway, Premier received praise for its work, *e.g.*, in conjunction with "'show & tells,' grand openings, photo shoots, and the like." Moore Decl. ¶ 4.

To service its contracts with Safeway, Premier had to employ union labor. *See* Premier 30(b)(6) Depo. at 36; Wecker Decl., Ex. 10 (7/18/2017 internal Safeway email). From 2001 to 2011, Premier participated in multi-employer bargaining agreements with the union. *See* Premier 30(b)(6) Depo. at 41-42. However, in 2011, Premier decided not to be a part of the multi-employer bargaining unit any longer and instead started to enter into its own separate agreements with the union.[3] *See* Premier 30(b)(6) Depo. at 46; *see also* Moore Decl. ¶ 9 (testifying that the union and Premier renegotiated contracts every two to three years).

According to Premier, after it withdrew from the multi-employer bargaining unit, the union

---

[2] Safeway has objected to some of the evidence submitted by Premier. *See* Docket No. 72 (objections). Many objections have been made on the basis of relevance. These objections are overruled. Relevance has a low bar and the evidence is generally helpful in providing background or context – *e.g.*, on the relationship between Premier and Safeway, or on the relationship between Premier and the union. For the remainder of this order, the Court addresses objections that do not involve relevance only where necessary (*i.e.*, where resolution of the motion depends on the evidence).

[3] According to Premier, it stopped participating in the multi-employer bargaining unit after it disassociated itself from Ray Oberlin. Mr. Oberlin was, for a time, a co-owner of Premier. He also owned a competing vendor (Crystal Cleaning Solutions). Premier did not know of Mr. Oberlin's "dual loyalties." Moore ¶ 9. Nor did it know that Mr. Oberlin was coordinating price increases with other floor care providers, in part through the multi-employer bargaining unit. After Premier discovered this information, it sued Mr. Oberlin and reached a settlement in which the parties discontinued all association. Premier then withdrew from the multi-employer bargaining unit. *See* Moore ¶ 9.

1    became hostile. *See* Moore ¶ 10 (testifying that "[t]he union's animosity toward Premier stemmed
2    from its preference for King whose workers constituted the vast majority of the members
3    employed in the unit and who shared the Union's animosity for Premier's independence from its
4    preferred multi-employer bargaining"). Premier asserts that the union was hostile even though, in
5    its separate agreements with the union, Premier did not pay less than the normal union rate and in
6    fact paid more. *See* Moore Decl. ¶ 11; Sanchez Decl. ¶ 4.

7    In 2015 – apparently close in time to Premier's negotiation of its contract with the union
8    and Premier's negotiation of its contract with Safeway – the union began to contact Safeway,
9    making complaints about Premier. *See, e.g.*, Wecker Decl., Ex. 5 (5/20/2015 email from King to
10   Safeway) (alerting Safeway that there was a union flyer that was telling members to call Safeway
11   and tell the company that "it's time for Premier and Paramount to sign the Northern California
12   Safeway Contractors Agreement").[4] The union also picketed against Premier at Safeway stores
13   during this time. *See* Moore Decl. ¶ 13. According to Premier, "[a]fter receiving pressure from
14   Safeway due to the picketing, [it] had no choice but to sign the Union contract on [its] terms or
15   risk losing [the] contract with Safeway."[5] Moore Decl. ¶ 14. Premier thereafter entered into a
16   new agreement with Safeway: the 2015 Master Agreement. *See* Premier 30(b)(6) Depo. at 50-51;
17   Stimeling Decl., Ex. E (2015 Master Agreement).

18   Subsequently, the union continued to make complaints about Premier to Safeway and
19   further promoted King over Premier as a vendor. *See, e.g.*, Wecker Decl., Ex. 9 (7/30/2015 email
20   from union to Safeway) (claiming that Premier was violating the collective bargaining agreement
21   whereas a competing vendor, King, was respecting the bargaining agreement); Wecker Decl., Ex.

---

[4] Premier emphasizes that, here, it was King who informed Safeway that the union was having conflict with Premier. According to Premier, this is evidence of "the concerted action among Safeway, King and the [union]." Opp'n at 8.

[5] Premier has generally suggested that any picketing at Safeway over the years was, for the most part, done by union members who were not Premier employees. *See, e.g.*, Moore Decl. ¶ 15 (testifying that, in 2013, "most Premier janitors were not active in the union because Premier paid them above union minimum wages"); Sanchez Decl. ¶ 7 (Premier employee testifying that, in 2017, he attended a picketing event but only because he was hoping to get union assistance on an issue related to a medical card).

13 (fall 2017 emails from union to Safeway) (claiming that there was possible wage theft by Premier, that Premier was refusing to come to a fair agreement with the union, etc.).[6] In other words, the relationship between the union and Premier did not improve.

In July 2017, Safeway's Northern California division issued a Request for Proposal ("RFP"), seeking bids from Premier and other vendors to clean the floors of Safeway stores in various locations. *See* Evans Depo. at 116; Stimeling Decl., Ex. F (2017 RFP); Moore Decl. ¶ 17. The employees at Safeway who were a part of this RFP process were:

- Rick Pickering,
- Nick Hines, and
- Stephanie Evans

Mr. Pickering was the Vice President of Operations for the Northern California Division. *See* Evans Depo. at 17. Mr. Hines was a Labor Analyst in the Northern California Division. *See* Hines Depo. at 12. Ms. Evans was a manager of national programs, responsible for conducting the RFP. *See* Evans Depo. at 13, 118-19; Stimeling Decl., Ex. F (2017 RFP § A) ("I will be acting on behalf of the National Program team, leading us through this RFP process."). It appears that Mr. Pickering was the final decisionmaker as to which vendors to select, although Mr. Hines and Ms. Evans assisted him in the process, *e.g.*, collecting information for him and discussing matters with him. *See* Pickering Depo. at 73; *see also* Evans Depo. at 76-77 (stating that the decision was not hers).

There ended up being two rounds of bidding (arguably, three, as discussed *infra*) in conjunction with the RFP. Premier made it to the second round but ultimately was not selected to service any of the Safeway stores, thus ending a relationship close to twenty years. Safeway informed Premier of the termination in February 2018, with the termination to go into effect in March. *See* Wecker Decl., Ex. 17 (2/26/2018 email from Evans to Moore); *see also* Moore Decl.,

---

[6] Safeway has objected to Exhibit 13 on the basis of hearsay, authentication, and relevance. As noted above, the relevance objection is overruled. The authentication objection is also overruled since the emails appear to have been produced by Safeway. As for the hearsay objection, the emails are not being submitted for the truth of the matter asserted but rather to show that the union was complaining about Premier.

4

1   Ex. X (same).

2   According to Safeway, it did not select Premier because of cost. Safeway notes the
3   following:

4  - On its face, the RFP stated that "[t]he Northern California Division is
5    predominantly concerned with getting the best pricing within the specifications
6    identified in this RFP," although "[o]ther considerations . . . will be quality, service
7    history, financial strength, and other offerings that are considered integral
8    components of your competitive advantage." Stimeling Decl., Ex. F (2017 RFP);
9    *see also* Pickering Depo. at 90 (testifying that cost reduction as the main driver of
10   the RFP process).

11 - Premier admitted at its deposition that price was a significant consideration for
12   Safeway in evaluating the bids. *See* Premier 30(b)(6) Depo. at 72.

13 - In October 2017, when Safeway informed Premier that it had made it to the second
14   round of bid reviews, *see* Premier 30(b)(6) Depo. at 119-20; Stimeling Decl., Ex. H
15   (10/26/2017 email from Evans to Moore), it asked Premier to focus on specific
16   stores and to "look at your pricing and let me know if there are any adjustments to
17   make." Stimeling Decl., Ex. H.

18 - For the second round bids, King had the most competitive bid. Additional vendors
19   other than King also had lower bids compared to Premier's. Premier had the third
20   or fourth most competitive bid. *See* Evans Depo. at 120, 127-28.

21 - In November 2017, Safeway had decided which vendors to use based on the second
22   round bids. Premier was one of several vendors that was initially selected, as was
23   King. *See* Wecker Decl., Ex. 17 (10/26/2017 email from Hines to Evans and
24   11/8/2017 email from Hines to Evans). Safeway also selected two new vendors
25   (*i.e.*, not incumbents): Cleaning Services Group ("CSG") and Township. Safeway
26   chose these new vendors because their bids resulted in more than $2.5 million in
27   annual savings. *See* Evans Depo. at 129; Stimeling Decl., Ex. G (11/8/2017 email
28   from Evans to Kunkley).

5

- In January 2018, however, problems arose with the two new vendors. *See* Wecker Decl., Ex. 17 (1/3/2018 email from Evans to Hines). Township ultimately declined the award on its bid, and CSG altered its bid, increasing its price. As a result, Safeway had to come up with a new option as to how to proceed, *i.e.*, shift costs. *See* Evans Depo. at 131-32; *see also* Wecker Decl., Ex. 17 (1/3/2018 email from Evans to Hines). Safeway ultimately decided to award Township's awards to King and further decided to shift Premier's awards to King. *See* Wecker Decl., Ex. 17 (1/26/2018 email from Evans to Hines and 3/20/2018 email from Pickering to Evans and Hines); *see also* Wecker Decl., Ex. 22 (1/9/2018 and 1/10/2018 emails from Hines to Pickering) (stating that, if Premier were to be eliminated and replaced by King, there would be savings of about $2.2 million; also stating that, "[f]rom what I know of Cedric [Moore of Premier] he will not go down in pricing" as "[w]e have asked three times for them to adjust it and . . . this is the best offer"). *But see* Opp'n at 17 (contending that Premier was only given a "single chance" to lower its bid); *see also* Hines Depo. at 102 (testifying that "I don't know how many times we went back to [Premier]").
- Safeway employees involved with the RFP denied that union considerations affected the decision making on the RFP. *See, e.g.*, Pickering Depo. at 88-89; Evans Depo at 165.

Premier disagrees with Safeway's position that cost was the reason why it terminated its relationship with Premier. According to Premier, Safeway ended the relationship because it capitulated to pressure from the union to get rid of Premier and replace it with King. Premier notes as follows:

- Shortly before the RPF process began, Premier was renegotiating its agreement with the union. *See* Moore Decl. ¶ 18 & Exs. P-Q (draft contract dated 11/2016; 5/4/2017 email reflecting continuing discussions between union and Premier). The union made threats to Premier, stating that it should sign the master agreement without changes or the union would shut down Premier by telling Safeway to stop

6

doing business with it.  *See* Moore Decl. ¶ 20 & Ex. Q (5/4/2017 email from labor consultant to union).

- In August 2017, shortly before initial bids in response to the RFP were due, the union contacted Safeway, claiming that there was possible wage theft by Premier, that Premier was refusing to come to a fair agreement with the union, etc.  *See* Wecker Decl., Ex. 13 (fall 2017 emails from union to Safeway).  The union conducted itself similarly in September 2017 as the bidding process continued.  *See* Wecker Decl., Ex. 13.

- Starting in November and December 2017, *i.e.*, after Premier was selected as the vendor for certain Safeway stores as part of the second round of bids, the union began to picket Safeway stores serviced by Premier on more than one occasion.  *See* Sanchez Decl. ¶ 6; Moore Decl. ¶ 23.  On each occasion, the picketing was disruptive – *e.g.*, involving shouting and yelling, banging drums, and marching through the stores (which hampered both Safeway workers from working and customers from shopping).  *See generally* Sanchez Decl.  A union representative explicitly stated that the picketing was being done "'to get Premier out of the Safeway stores and get King [the competing vendor] in'" – *i.e.*, to get Safeway to replace Premier with King.  Sanchez Decl. ¶ 10.  The union representative also told picketers that "Premier didn't want to sign the Union contract and because of that, we were going to take the stores away from Premier and give them to King because King would give its employees better benefits than Premier."  Sanchez Decl. ¶ 10.  Few if any Premier employees were part of the picketing.  *See generally* Sanchez Decl.

- On prior occasions – both before and after Premier had opted out of the multi-employer bargaining unit – Safeway would get in touch with Premier if there seemed to be any problems with the union, *i.e.*, so that the problems could be resolved.  *See, e.g.*, Wecker Decl., Ex. 4 (2/18/2010 internal Safeway email) (noting that Safeway was trying to get an update from Premier about union

7

activity); Wecker Decl., Ex. 6 (5/21/2015 internal Safeway email) (noting that Safeway had a meeting scheduled with Premier and the union to get an issue resolved); Hines Depo. at 26. However, for the picketing that was done in November and December 2017 and thereafter, Safeway did not inform Premier about any issues with the union, *see* Moore Decl. ¶ 25 (testifying to his "surprise[] that Hines [of Safeway] had not sent to me reports of all the events as they happened as that had been the practice of Safeway for many years") – although Safeway did contact the police. *See* Sanchez Decl. ¶¶ 14, 17-18; *see also* FAC ¶¶ 21-22, 24-25.

- Between November 2017 and January 2018, Safeway essentially engaged in a third round of bidding (*i.e.*, determining what to do after the new vendors did not work out) and did not invite Premier to participate in that third round. *See* Opp'n at 18.

## II.     DISCUSSION

A.     Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B.  Causes of Action

In the case at bar, Premier has asserted three claims against Safeway.[7] Those claims are as follows.

- **Civil conspiracy.** Premier alleges that the union engaged in an illegal secondary boycott in violation of the National Labor Relations Act – *i.e.*, threatening, coercing, or restraining the secondary (neutral) employer (Safeway) so that it would cease doing business with the primary employer (Premier). *See* FAC ¶ 40 (citing 29 U.S.C. § 158(b)(4)(ii)); *see also Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 943-44 (9th Cir. 2014) (noting that secondary boycotts "are directed at parties who are not involved in the labor dispute, as opposed to primary boycott activities in which a union pressures an employer to change its behavior"; "'[t]he gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it,'" and "'[i]ts aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands'"). According to Premier, "Safeway is responsible for the harm because it joined in a conspiracy to commit these activities by joining with the Union and King to implement an unfair and sham bidding process that resulted in King replacing Premier as Safeway contractors." FAC ¶ 40. Safeway agreed with the union and King, and it terminated Premier "to serve the purposes of the conspirators." FAC ¶ 41.
- **Breach of contract.** Premier alleges: "On or about March 25, 2018, Safeway breached the [parties' 2015] agreement [which provided that Premier would provide floor care services through December 2018] by terminating Plaintiff [in March 2018] for reasons of [Safeway's] concerted activities with the labor union

---

[7] At the time that Safeway filed its motion for summary judgment, Premier had also asserted a fourth claim: one for fraud. However, Premier dropped the fraud claim after Safeway filed its motion.

9

representing Premier's employed." FAC ¶ 37.

- **Section 17200 violation.** Premier asserts that there was a conspiracy with the union and King and that there was a sham bidding process. *See* FAC ¶ 45.

In the pending motion, Safeway seeks summary judgment on each of the three causes of action.

C.   Civil Conspiracy

As noted above, the gist of Premier's claim for civil conspiracy is that the union engaged in a secondary boycott prohibited by § 158(b)(4)(ii) – so as to pressure Safeway to drop Premier in favor of King – and that Safeway agreed with the union and King to terminate Premier. Safeway is entitled to summary judgment on the civil conspiracy claim for several reasons.

First, at the hearing, Premier stated that its civil conspiracy claim was predicated on state law. However, under state law, there is no such thing as an independent claim for civil conspiracy. "Civil conspiracy is not an independent cause of action. Instead, it is a theory of co-equal legal liability under which certain defendants may be held liable for 'an independent civil wrong' committed by others." *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1291 (2015); *see also Rusheen v. Cohen*, 37 Cal. 4th 1048, 1062 (2006) ("[A] civil conspiracy does not give rise to a cause of action unless an independent civil wrong has been committed.").

When the Court questioned Premier about the independent civil wrong, Premier stated that the underlying tort was the secondary boycott engaged in by the union which violated federal law. The federal law at issue is 29 U.S.C. § 158, which provides in relevant part as follows: "It shall be an unfair labor practice for a labor organization or its agents – . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is – . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii). But notably, § 158 prohibits conduct by a union only, and nothing in the statute suggests that liability extends to those who conspire with a union. *Cf. Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 841-42 (2d Cir. 1998) (rejecting conspiracy liability for § 10(b) securities claims; "[j]ust as Congress clearly knew how to impose aiding and abetting liability when it chose to do so, thereby suggesting that its absence from § 10(b) should not be disregarded,

10

the existence of statutes expressly providing for conspiracy liability warrants the same conclusion here"). Given that § 158 does not provide for conspiracy liability or any other basis for liability of a party in Safeway's position, it cannot be used as a basis for state conspiracy. Certainly, Premier has not cited any authority supporting the proposition that a defendant may be held liable under a state law conspiracy theory when the underlying tort is a federal law that does not recognize conspiracy liability.

Second, even if there could be conspiracy liability for a violation of § 158, such liability requires that there be an agreement among the co-conspirators. *See Mandel v. Hafermann*, 503 F. Supp. 3d 946, 985 (N.D. Cal. 2020) ("'The elements of a civil conspiracy claim under California state law are 1) the formation of a group of two or more persons who *agreed* to a common plan or design to commit a *tortious* act; 2) a wrongful act committed pursuant to the agreement; and 3) resulting damages.'") (emphasis added); *see also Rusheen*, 37 Cal. 4th at 1062 ("The elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design."). Here, the underlying tort claimed by Premier is, as noted above, a secondary boycott. But Premier has failed to explain how Safeway could plausibly have entered into an *agreement* with the union (or King) when Premier's position is that the union (along with King) *coerced* Safeway to stop doing business with Premier. Coercion is antithetical to a voluntary agreement.[8] *Cf. United States v. Orosco*, No. 22-3608, 2024 U.S. App. LEXIS 4406, at *7 (6th Cir. Feb. 26, 2024) (addressing a conspiracy under 18 U.S.C. § 1846; stating that, "[t]o prove a drug conspiracy, the government must show (1) that two or more individuals have agreed to violate a drug law and (2) the defendant knowingly and voluntarily entered into the agreement"). Premier admitted as much in its 30(b)(6) deposition, with Mr. Moore testifying that Safeway did not have an agreement with the union (or King) to terminate its relationship with Premier. Mr. Moore testified: "It's not an agreement. What they did is because of what the union and King did together, you know what I mean, to Safeway, it hurt our relationship, and due to that, they terminated me." Premier 30(b)(6) Depo. at

---

[8] Certainly, the victim of, *e.g.*, blackmail, extortion, or a threat cannot be said to be a co-conspirator of the perpetrator.

11

441. He also testified: "Safeway caved in to the union and King and got rid of [Premier], they [were] not neutral, the pressure was heavy and they followed suit." Premier 30(b)(6) Depo. at 443.

Third, even if Safeway could – in theory – have entered into a voluntary agreement with the union (or King), no reasonable jury could find that Safeway's decision on the 2017 RFP was influenced by union activity. Premier argues that there is circumstantial evidence because, after the union started picketing Safeway stores in late 2017, Safeway did not ask Premier to participate in a third round of bidding in early 2018. But Premier ignores the broader factual context. By early 2018, Premier had already participated in two rounds of bidding – and notably, Safeway had counseled it to adjust its pricing for the second round. *See* Stimeling Decl., Ex. H (10/26/2017 email from Evans to Moore) (asking Premier to "look at your pricing and let me know if there are any adjustments to make"). The union complaints about Premier were long standing, stretching back to at least 2015 and through 2017; yet Safeway continued to engage Premier and still chose Premier for round two. For the second round, Premier did not have the lowest bid; rather, King did. Premier had the third or fourth most competitive bid. *See* Evans Depo. at 120, 127-28. Given that Safeway had already given Premier an opportunity to submit a more competitive bid, its failure to ask Premier to submit another bid in a third round was not damning. This is particularly true given that Safeway was in a situation in which it had lost two vendors who had given it cost savings of $2.5 million; eliminating Premier and replacing it with King would result in cost savings of about $2.2 million. *See* Wecker Decl., Ex. 22 (1/9/2018 and 1/10/2018 emails from Hines to Pickering).[9] Replacing the two vendors with Premier instead of King would have made little sense since Premier was more expensive than King.

Implicitly recognizing problems with its conspiracy theory, Premier suggested in its

---

[9] In one of these emails, Mr. Hines noted that there had been some "headaches" with Premier. Wecker Decl., Ex. 22 (1/9/2018 email from Hines to Pickering). At the hearing, Premier suggested that this was a reference to union problems. But nothing on the face of the email suggests such. Moreover, Premier again ignores the broader context. In the email, Mr. Hines stated that, if Premier were replaced by King, there would be cost savings of $2.2 million, but then added: "I think that Premier is a good company and we have headaches, but they do a good job. I know Randy stated a $1.5M savings, so we could balance the overspend in some districts with Premier." Wecker Decl., Ex. 22. Thus, Premier was still being considered as an option.

opposition brief that Safeway could still be liable on an aiding and abetting theory. *See* Opp'n at 22 (stating that "California law accepts Section 876 of the Restatement Second of Torts as applicable to liability for aiding and abetting the wrongful conduct of another"). But Premier never asserted an aiding and abetting theory in its operative complaint and, at this juncture, with trial upcoming in a few months, it is too late to add a new theory of liability. *See Desoto Cab Co. v. Uber Techs.*, No. 4:16-CV-06385-JSW, 2019 U.S. Dist. LEXIS 240643, at *13-14 (N.D. Cal. Aug. 13, 2019) ("The danger of prejudice is heightened when a plaintiff seeks to amend its complaint in the later stages of litigation or on the eve of trial."); *Stuart v. Cnty. of Riverside*, No. 5:22-cv-00701-SPG-MAR, 2024 U.S. Dist. LEXIS 111023, at *18 (C.D. Cal. June 14, 2024) ("[A]llowing Plaintiffs to advance a new theory of liability on the eve of trial would be highly prejudicial to the County.").

Even if the Court were inclined to allow the theory of aiding-and-abetting liability, no reasonable jury could find such liability based on the evidence submitted in conjunction with summary judgment.

> California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort. "'Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'

*Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144 (2015). According to Premier, "Safeway . . . substantially contributed to the wrongful conduct [of the union and/or King] by maintaining silence in the face of illegal boycotting and failing to investigate and advise impacted contractors of efforts by the union to pressure it to favor one contractor over another." Opp'n at 23.

In its papers, Safeway suggests that no reasonable jury could find in Premier's favor given that there is no genuine dispute that "Safeway responded to each protest [*i.e.*, act of picketing] . . . by calling the police to end the demonstration, which is a far cry from 'encouraging' or 'substantially contributing' to the allegedly wrongful protests." Reply at 3 n.2. This argument has

1  merit. Furthermore, a more fundamental problem for Premier is that a mere failure to act typically
2  does not constitute substantial assistance or encouragement. *See, e.g.*, *Austin B. v. Escondido*
3  *Union Sch. Dist.*, 149 Cal. App. 4th 860, 879 (2007) (noting that "[m]ere knowledge that a tort is
4  being committed and the failure to prevent it does not constitute aiding and abetting" and that,
5  "[a]s a general rule, one owes no duty to control the conduct of another"; "[h]ere, the evidence of
6  the individual [school district] employees' actions amounts at most to a showing that they had
7  knowledge of [preschool instructor's] allegedly tortious conduct [against students] and failed to
8  take action to prevent it") (internal quotation marks omitted); *Fiol v. Doellstedt*, 50 Cal. App. 4th
9  1318, 1326 (1996) (in considering whether a supervisory employee could be held liable under an
10 aiding-and-abetting theory for failure to prevent the misconduct of a subordinate, stating that
11 "mere failure to act does not constitute the giving of 'substantial assistance or encouragement' to
12 the tortfeasor"); *see also* CACI 3610 (instructing that "[m]ere knowledge that [a/an] [*e.g.*, assault
13 and battery] was [being/going to be] committed and the failure to prevent it do not constitute
14 aiding and abetting"); *cf. Am. Master Lease*, 225 Cal. App. 4th at 1475-76 (noting that aiding and
15 abetting does not require a defendant to *agree* to join the wrongful conduct, "it necessarily
16 requires a defendant to reach a conscious decision to participate in tortious activity for the purpose
17 of assisting another in performing a wrongful act") (internal quotation marks omitted).
18         This is not to say that a failure to act can never be aiding and abetting. *See Hooters of Am.,*
19 *LLC v. Superior Court*, No. E082896, 2024 Cal. App. Unpub. LEXIS 3388, at *12-13 (Cal. Ct.
20 App. May 31, 2024) (stating that "the principle that a defendant is not liable for the mere failure to
21 prevent another's tortious conduct is a far cry from the sweeping interpretation advanced by HOA
22 that all omissions (i.e. 'inaction') are categorically excluded as a basis for liability under an aiding
23 and abetting theory"). In *Hooters* – an unpublished decision – the state court explicitly noted that
24 "a decision not to act may constitute substantial assistance when considered *in combination* with
25 other affirmative acts or representations." *Id.* at *14 (emphasis added; citing *Schulz v. Neovi Data*
26 *Corp.*, 152 Cal. App. 4th 86, 94-95 (2007)). The *Hooters* court further noted that "the failure to
27 exercise a reserved discretionary right to prevent known tortious conduct by another may
28 constitute substantial assistance." *Id.* (citing *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 927

14

(2023) (finding substantial assistance or encouragement sufficiently pled based on allegations that, "[e]ach time an advertiser used the Audience Selection tool and made a discriminatory targeting decision based on age or gender, Facebook followed the selected audience parameters" even though it "retain[ed] the discretion to reject ads that include age- or gender-based restrictions")). Neither of these circumstances, however, is applicable here. For instance, Premier does not point to any affirmative acts by Safeway. Nor does it claim that Safeway had a discretionary right to prevent tortious conduct by the union or King. Furthermore, the fact that Safeway had, in the past, informed Premier about issues with the union does not mean that Safeway thereby gave substantial assistance or encouragement by not telling Premier about union problems at or about the time of the RFP at issue.

Accordingly, the Court grants Safeway's motion for summary judgment on the claim for civil conspiracy.

D.      Breach of Contract/Breach of the Implied Covenant and Fair Dealing

In its FAC, Premier asserted a claim for breach of contract (including breach of the implied covenant of good faith and fair dealing) based on the 2015 Master Agreement entered into by the parties. *See* Stimeling Decl., Ex. E (2015 Master Service Agreement). Premier alleged that, "[b]y the terms of said written agreement, absent termination, Premier would provide floor care services for Safeway grocery stores through December 31, 2018." FAC ¶ 34. However, "[o]n or about March 25, 2018, Safeway breached the agreement by terminating Plaintiff for reasons of its concerted activities with the labor union representing Premier's employed." FAC ¶ 38.

In the pending motion, Safeway moved for summary judgment because there is no genuine dispute that the parties entered into a *new* contract when Premier submitted a bid in response to Safeway's RFP. Premier conceded such in its 30(b)(6) deposition. *See* Premier 30(b)(6) Depo. at 70. Under the new contract, Safeway could terminate the earlier agreement it had with Premier (an "Incumbent Services Provider") and not incur liability. *See* Premier 30(b)(6) Depo. at 78-79. Here, the terms of the agreement specifically state that, upon submission in response to an RFP, the then current contract became terminable. *See* Stimeling Decl., Ex. F (2017 RFP § G.6) ("If you currently provide services . . . , by responding to this RFP, you acknowledge and

15

1    unconditionally agree that Northern California Division may, at its sole discretion, immediately

2    terminate in whole or in part, any existing agreement between your company and Northern

3    California Division, regardless of the parties' termination rights under the existing agreement and

4    irrespective of the terms and conditions of such existing agreement and that by doing so, Northern

5    California Division shall not incur any liability for the termination of such agreement").

      Faced with this evidence, Premier completely dropped the theory that Safeway breached the 2015 Master Agreement (either a breach of an express term of the agreement or a breach of the implied covenant of good faith and fair dealing that inheres in every contract).  In its opposition brief, Premier made no substantive response to Safeway's argument above.

      Instead, Premier now claims a new factual theory for breach of contract – or rather, breach of the implied covenant of good faith and fair dealing.  According to Premier, Safeway breached the implied covenant because, implicitly, with the RFP, "Safeway both promised a fair and thorough bid process and owed a duty to abide by laws and governmental rules"; however, Safeway failed to comply with that promise or duty by conspiring with the union and King. Opp'n at 24.

      The Court rejects this new factual theory because it was never alleged in the complaint and has been sprung in the opposition brief for the first time.  In addition, even if the Court were to consider the new theory on the merits, it suffers from several problems.

      First, as discussed above, there is no evidence to support a conspiracy involving Safeway.

      Second, the implied covenant of good faith and fair dealing cannot be contrary to the express terms of the contract.  *See Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1061-62 (2010) (stating that "[t]he implied covenant cannot contradict the express terms of a contract[;] [s]imilarly, the implied covenant cannot be used to limit or restrict an express grant of discretion to one of the contracting parties.").  Here, it is doubtful that there was an implied promise that the RFP would be conducted fairly and thoroughly given that the RFP contained express terms such as the following which gave Safeway unfettered discretion to act. *See Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221, 2010 U.S. Dist. LEXIS 43076, at *8 (N.D. Cal. Apr. 8, 2010) (indicating that conferral of unfettered discretion under a contract defeats a claim of

16

breach of the implied covenant of good faith and fair dealing); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120-21 (2008) (stating that "the implied covenant finds 'particular application in situations where one party is invested with a discretionary power affecting the rights of another,' [but] if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing'"). The documents in evidence reflect:

- "This RFP does not commit Albertsons Companies, its regional operations, or any other member of their staffs to any specific course of action. The issuance of this RFP does not bind Albertsons Companies to accept any proposal, in whole or in part, whether or not it includes the lowest bid. Nor does it bind Albertsons Companies to provide any explanation or reason for its decision to accept or reject any proposal. [¶] Albertsons Companies reserves the right to: . . . Reject any or all proposals . . . ; Choose a respondent or respondents on the basis of the proposal received without discussions or requests for best and final offers . . . ." Stimeling Decl., Ex. F (2017 RFP § E).
- "Nothing contained in this RFP can be relied upon as a commitment, guarantee or representation regarding future events or performance." Stimeling Decl., Ex. F (2017 RFP § F).

*See, e.g.*, *Stonebrae*, 2010 U.S. Dist. LEXIS 43076, at \*14-15 (discussing cases where courts had found unfettered discretion based on language such as: the City "may at any time and from time to time, in its sole discretion and at its own expense, install or permit to be installed other items of equipment or other personal property in or upon the Telecom system"; "Purchaser shall not be under any obligation to exercise any of the rights granted to Purchaser hereunder[,] and any and all said rights may be assigned by Purchaser, and/or licenses may be granted by Purchaser with respect thereto, as Purchaser may see fit"; the company "may at our election refrain from any or all of the foregoing") (emphasis and internal quotation marks omitted).

Finally, to the extent Premier claims an implied promise to comply with the law, federal

17

1   labor law's prohibition on secondary boycotts, as discussed above, does not appear to be

2   applicable to Safeway (in contrast to the union). Furthermore, the analysis of Judge Koh in

3   *Landucci v. State Farm Insurance Co.*, 65 F. Supp. 3d 694 (N.D. Cal. 2014), is persuasive:

> The Court . . . dismisses with prejudice Plaintiff's implied contract claim based on the alleged failure by Defendants to follow the law. Defendants argue Plaintiff's breach of implied contract claim fails as a matter of law because it "is based on an alleged contractually binding promise by State Farm to abide by the law" and that State Farm "breached its expressed and implied duty at law to provide a work environment free of discrimination and to take all reasonable steps to prevent discrimination." Mot. at 12 (citing complaint at ¶ 82). Defendants argue that "contracts requiring a party to abide by the law lack adequate consideration, and therefore are invalid." *Id.* at 13. Defendants are correct. In California, a promise to refrain from unlawful conduct is unlawful consideration. *See Kallen v. Delug*, 157 Cal. App. 3d 940, 949 (1984). Thus, a contract that includes such a promise as consideration is illegal, and thus void. *Id.*; *see also Schaefer v. Williams*, 15 Cal. App. 4th 1243, 1246-47 (1993) (holding that a contract cannot be premised on a promise to not break the law); *Floor Seal Technology, Inc. v. Sinak Corp.*, 156 Fed. Appx. 903, at *1 (9th Cir. 2005). Accordingly here, any contract based on a promise by State Farm to comply with the anti-discrimination statutes such as the FEHA or Title VII is void as illegal. Thus, the Court dismisses with prejudice Plaintiff's claim that she had an implied contract with State Farm that State Farm would obey the law.

*Id.* at 715; *cf.* Rest. (First) of Contracts § 578 & comment (providing that "[a] bargain, the sole consideration of which is refraining or promising to refrain from committing a crime or tort, or from deceiving or wrongfully injuring the promisee or a third person, is illegal" because, if allowed, "threats of various wrongs might be made a means of exacting payment"; however, "a bargain with sufficient legal consideration is not rendered illegal by the addition of a promise to refrain from misconduct, unless that promise was used as a means of exacting greater compensation").

The Court therefore grants summary judgment on Premier's claim for breach of contract/breach of the implied covenant of good faith and fair dealing.

E.   <u>Section 17200</u>

Finally, Premier asserts a claim for violation of § 17200. In the FAC, Premier refers to a "conspiracy with the Union and a competing vendor [King]" and a "sham bidding process." FAC ¶ 45.

In its motion, Safeway argues that the § 17200 claim is essentially a derivative claim; therefore, summary judgment on the conspiracy and contract claims would dictate summary judgment on the § 17200 claim as well. Safeway also argues that dismissal of the § 17200 claim is warranted because, "[i]n *Sonner v. Premier Nutrition Group*, 971 F.3d 834, 844 (9th Cir. 2020), the Ninth Circuit concluded that when there is an adequate remedy at law, federal courts cannot hear UCL claims, which sound in equity." Mot. at 14.

The Court need not address the *Sonner* argument because, at the hearing, Premier expressly agreed with Safeway that its § 17200 claim is derivative of its claims for civil conspiracy and breach of contract/breach of implied covenant. In light of this concession, and the Court's disposition of these claims in favor of Safeway, summary judgment on the § 17200 claim is warranted.

### III. CONCLUSION

For the foregoing reasons, Safeway's motion for summary judgment is granted. The Court instructs the Clerk of the Court to enter a final judgment in favor of Safeway accordance with this order.

The Court notes that Safeway still has a motion for sanctions pending. Now that the parties have the benefit of the Court's rulings here, the Court orders the parties to meet and confer to see if they are able to reach an agreement that would render the sanctions motion unnecessary. The parties shall file a status report within three weeks of the date of this order.

**IT IS SO ORDERED**.

Dated: July 22, 2024

_____
EDWARD M. CHEN
United States District Judge