UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PREMIER FLOOR CARE, INC., | Case No. 21-cv-04188-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR ATTORNEY FEES** |
| ALBERTSONS COMPANIES, INC., et al., | |
| Defendants. | Docket No. 88 |

In 2021, Plaintiff Premier Floor Care, Inc. filed suit against Defendants Albertson Companies, Inc. and Safeway, Inc. (collectively, "Safeway"). For many years, Safeway had hired Premier to clean the floors in certain stores in Northern California. However, in early 2018, Safeway terminated its relationship with Premier. According to Premier, Safeway terminated the relationship based on pressure from a local union who wanted Safeway to use a different vendor instead – a company known as King. (Both Premier and King have unionized employees.)

In July 2024, the Court granted Safeway's motion for summary judgment and thereby dismissed all of Premier's claims. *See* Docket No. 82 (order). Now pending before the Court is Safeway's motion for attorneys' fees pursuant to contract. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Safeway's motion.

## I.      FACTUAL & PROCEDURAL BACKGROUND

Premier initiated this lawsuit against Safeway in March 2021, several years after it had settled a lawsuit that it had filed against the union. *See* Docket No. 82 (Order at 1 n.1) (noting that Premier's lawsuit against the union was filed in 2018 and settled in August 2019). In its original

United States District Court
Northern District of California

1 | complaint, Premier asserted four causes of action against Safeway: (1) fraud; (2) breach of

2 | contract/breach of the implied covenant; (3) civil conspiracy; and (4) violation of § 17200.

3 | • For (1), Premier alleged fraud on the basis that Safeway conducted a "sham RFP

4 | [request for proposal] bidding process" that favored King and "did not permit

5 | Premier to have a fair and equal opportunity to bid for its contracts."  Compl. ¶ 34.

6 | • For (2), Premier alleged that the parties had entered into the 2015 Master

7 | Agreement ("2015 MSA") and that "Safeway breached the agreement by

8 | terminating [Premier] for reasons of its concerted activities with the labor union."

9 | Compl. ¶ 40.

10 | • For (3), Premier alleged that the union violated the Labor Management Relations

11 | Act ("LMRA") by engaging in a secondary boycott and that Safeway was

12 | responsible for the harm suffered by Premier "because it joined in a conspiracy to

13 | commit these activities by joining with the Union and King to implement an unfair

14 | and sham bidding process that resulted in King replacing Premier as Safeway

15 | contractors."  Compl. ¶ 43.

16 | • For (4), Premier alleged a derivative claim.

17 | In August 2023, the parties attended a mediation but the case did not settle.  *See* Docket

18 | No. 49 (certification of ADR session).

19 | In April 2024, Safeway filed its motion for summary judgment.  *See* Docket No. 62

20 | (motion).

21 | Several days later, in May 2024, the parties stipulated to an amended complaint in which

22 | Premier dropped its fraud claim.  However, Premier still proceeded with its remaining claims

23 | based on the same factual predicates.  *See* Docket No. 64 (stipulation).

24 | In early July 2024, after summary judgment briefing was completed, Safeway filed its

25 | motion for sanctions, asking for both dismissal of the case and an award of attorneys' fees.  *See*

26 | Docket No. 77 (motion).  The sanctions motion was filed just days before the summary judgment

27 | hearing.  *See* Docket No. 79 (minutes).  The Court subsequently deferred the hearing and briefing

28 | schedule on the sanctions motion so that it could deal with the summary judgment motion first.

1    *See* Docket No. 81 (order).

2            In late July 2024, the Court granted Safeway's motion for summary judgment in its

3    entirety.  *See* Docket No. 82 (order).

4            • For the claim of breach of contract, Safeway did not improperly terminate the 2015

5              MSA because (1) the parties entered into a new contract when Premier submitted a

6              bid in response to Safeway's 2017 RFP and (2) the terms of the 2017 RFP allowed

7              Safeway to terminate the 2015 MSA without incurring liability.  *See* Docket No. 82

8              (Order at 15-16).

9            • For the civil conspiracy claim, there were multiple deficiencies.  For example,

10             Premier claimed a conspiracy under state law but, under California law, "there is no

11             such thing as an independent claim for civil conspiracy."  Docket No. 82 (Order at

12             10).  To the extent Premier argued there was a conspiracy to violate a federal

13             statute, 29 U.S.C. § 158, that statute prohibits conduct by a union alone, and

14             "nothing in the statute suggests that liability extends to those who conspire with a

15             union."  Docket No. 82 (Order at 10).  Furthermore, even if there could be

16             conspiracy liability for a violation of § 158, an agreement among the co-

17             conspirators would be required but Premier "failed to explain how Safeway could

18             plausibly have entered into an *agreement* with the union (or King) when Premier's

19             position is that the union (along with King) *coerced* Safeway to stop doing business

20             with Premier."  Docket No. 82 (Order at 11) (emphasis in original).

21           • Finally, the § 17200 was a derivative claim only and thus failed for the same

22             reasons that the contract and tort claims failed.  *See* Docket No. 82 (Order at 19).

23           Having disposed of the above claims, the Court then directed the parties to meet and confer

24    to see if they could reach an agreement that would render the sanctions motions unnecessary.  *See*

25    Docket No. 82 (Order at 19).  The parties were unable to reach agreement on the sanctions motion,

26    and Safeway thereafter filed a separate motion for attorneys' fees, seeking fees on a basis

27    independent of sanctions.

28

United States District Court
Northern District of California

1    In August 2024, Premier appealed the Court's judgment to the Ninth Circuit.[1] *See* Docket

2    No. 88 (appeal).

3                                      **II.      DISCUSSION**

4    A.      <u>Legal Standard</u>

5            As noted above, Safeway has filed two motions in support of its position that it should be

6    awarded its attorneys' fees.  At this juncture, the Court does not address the sanctions motion and

7    considers only the fee motion.

8            In the fee motion, Safeway argues that it is entitled to fees pursuant to contract and/or

9    California Civil Code § 1717.  The proper starting point for the fee motion is California Code of

10   Civil Procedure § 1021 which provides in relevant part: "Except as attorney's fees are specifically

11   provided for by statute, the measure and mode of compensation of attorneys and counselors at law

12   is left to the agreement, express or implied, of the parties . . . ."  Cal. Code Civ. Proc. § 1021.

13   Section 1021 "permits parties to contract out of the American rule [where each party pays its own

14   attorneys' fees] by executing an agreement that allocates attorney fees." *Mountain Air Enters.,*

15   *LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 751 (2017) (internal quotation marks omitted).

16           Consistent with Section 1021, the parties can agree to shift fees on an action based on

17   contract under § 1717 which provides:

18           In any action on a contract, where the contract specifically provides
             that attorney's fees and costs, which are incurred to enforce that
19           contract, shall be awarded either to one of the parties or to the
             prevailing party, then the party who is determined to be the party
20           prevailing on the contract, whether he or she is the party specified in
             the contract or not, shall be entitled to reasonable attorney's fees in
21           addition to other costs.

22   Cal. Civ. Code § 1717(a).

23           The question here is what precisely did the parties agree to under the contract upon which

24

25   [1] Both parties have implicitly agreed that the appeal does not bar this Court from adjudicating the
     pending fee motion.  *See also* Moore's Fed. Prac. – Civ. § 303.32 (stating that "[m]ost courts have
26   held that a district court may award attorney's fees and impose sanctions after a timely notice of
     appeal has been filed" because "an award of attorney's fees and the imposition of sanctions do not
27   involve the merits of the case").

28

United States District Court
Northern District of California

1    Safeway relies on as a basis for fees?

2    B.    2015 Master Services Agreement

3    The contract that Safeway specifically relies on is the 2015 Master Services Agreement

4    ("2015 MSA").  There is no dispute that the parties did enter into the MSA.  *See* Docket No. 1-1

5    (2015 MSA).  There is also no dispute that this contract governed the terms under which Premier

6    provided services to Safeway for a specific period of time.  The term of the agreement was from

7    June 21, 2015, to December 31, 2018, unless, *e.g.*, a party terminated "with or without cause, by

8    providing the other party sixty (60) days' prior written notice thereof."  2015 MSA ¶¶ 1.5-1.6.

9    The 2015 MSA contains the following fee provision:

> This Agreement shall be governed by and construed in accordance
> with the law of the State of California, without regard to the conflict
> of laws principals [sic] thereof.  For purposes of any court
> proceeding referred **arising under this Agreement**, the parties
> hereby irrevocably agree and consent to the personal jurisdiction and
> venue of the state and federal courts located in Alameda County,
> California, U.S.A. and any objection to the jurisdiction or venue of
> any such court is hereby waived.  The **prevailing party** in any
> arbitration or court action or proceeding shall be awarded its
> reasonable attorneys' fees and costs and reasonable expert witness
> fees.

16    2015 MSA ¶ 8.10 (emphasis added).

17    Safeway terminated its relationship with Premier in February 2018, effective March 2018.

18    *See* Docket No. 82 (Order at 4).  This was in advance of the December 2018 "regular" termination

19    date provided for by the 2015 MSA (and without sixty days' notice of termination).  Safeway

20    terminated the relationship because it did *not* select Premier as a vendor for its 2017 Request for

21    Proposal ("RFP") (*i.e.*, where it sought bids from Premier and other vendors to clean the floors of

22    Safeway stores in various locations).  According to Premier, there was an unfair and sham bidding

23    process that resulted in Premier not getting selected to service any stores for the 2017 RFP.

24    Unlike the 2015 MSA, the 2017 RFP does not contain any fee provision.

25    C.    "Arising Under"

26    Safeway argues that it is entitled to fees pursuant to the 2015 MSA's fee provision: "The

27    prevailing party in any arbitration or court action or proceeding shall be awarded its reasonable

28    attorneys' fees and costs and reasonable expert fees."  2015 MSA ¶ 8.10.

United States District Court
Northern District of California

1    As an initial matter, the Court takes note that Safeway does not assert that, in *any* litigation

2    between the parties, whoever prevails is entitled to fees.  Instead, Safeway agrees that under the

3    2015 MSA, entitlement to fees is predicated on the case or claims "arising under" the 2015 MSA.

4    Safeway effectively construes the provision awarding fees to the prevailing party as modified by

5    the preceding sentence which refers to "any court proceeding referred [sic] arising under this

6    Agreement."  Premier agrees that "arising under" qualifies entitlement to fees.

7    Here, Premier's suit originally consisted of the following claims: fraud, breach of contract,

8    civil conspiracy, and violation of § 17200.  The parties essentially agree that the § 17200 claim is

9    a derivative one, and thus the Court may focus on the remaining claims for fraud, breach of

10    contract, and civil conspiracy.  The question as framed by the parties is: did any or all of these

11    claims "arise under" the 2015 MSA?[2]

12    As framed by the parties, the answer to that question turns on what "arising under" means.

13    However, whether that phrase is given a broad meaning (as advocated by Safeway) or a narrow

14    one (as advocated by Premier), it is clear that the claim for breach of contract is one that does

15    "arise under" the 2015 MSA.

16    D.    Breach of Contract

17    In both the original complaint and the first amended complaint ("FAC"), the claim for

18    breach of contract was for breach of the 2015 MSA.  For example, in the original complaint,

19    Premier alleged that:

20        • "On or about June 21, 2015, Premier and Safeway entered into a written agreement,

21           a copy of which is attached hereto as Exhibit 'A' and made a part hereof.  By the

22           terms of said written agreement, absent termination, Premier would provide floor

23           care services for Safeway grocery stores through December 31, 2018."  Compl. ¶

24           37.

25        • "On or about March 25, 2018, Safeway breached the agreement by terminating

26           Plaintiff for reasons of its concerted activities with the labor union representing

27    _____

28    [2] The Court recognizes that Premier dropped its fraud claim in its amended pleading which was
     filed shortly after Safeway moved for summary judgment.

6

1                Premier's employed."  Compl. ¶ 40.

2    The same allegations are made in the FAC.  *See* FAC ¶¶ 34, 37.

3           It is clear that this claim for breach of the 2015 MSA is one that "arises under" the

4    agreement.  Even if the Court were to interpret "arising under" narrowly – *e.g.*, to mean a claim

5    that requires interpretation of the 2015 MSA or a claim to enforce the 2015 MSA – that

6    requirement has been met.  By claiming breach of the 2015 MSA, Premier is seeking enforcement

7    of it.  *See also* Compl. ¶ 41 ("By reason of Safeway's breach of the contract as herein alleged, the

8    plaintiff has suffered damages in an amount to be determined at trial of this matter, and has

9    included [sic] attorney's fees in enforcing the contract."); FAC ¶ 38 (same).

10          To be sure, in the original complaint and FAC, Premier alleged that Safeway breached the

11   2015 MSA as a result of the conspiracy it had with the union and/or King.  *See, e.g.*, FAC ¶ 37

12   (alleging that, "[o]n or about March 25, 2018, Safeway breached the agreement by terminating

13   Plaintiff for reasons of its concerted activities with the labor union representing Premier's

14   Employed").  However, the reason *why* Safeway breached the 2015 MSA is not material to

15   whether it breached the contract.  The alleged breach of contract here does not turn on Safeway's

16   scienter.  *See Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1109 (2015)

17   ("The elements of a cause of action for breach of contract are (1) the contract, (2) plaintiff's

18   performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages

19   to plaintiff.") (internal quotation marks omitted).

20          Premier argues that its breach-of-contract claim was not really about enforcement of the

21   2015 MSA and instead was about not being selected as a vendor pursuant to the 2017 RFP.  In

22   support, Premier points to its initial disclosures on damages: "Premier's claims for damages were

23   limited to those lost profits that derived from its failure to obtain a new contract, not for an early

24   termination of the 2015 MSA."  Opp'n at 3.  But Premier cannot avoid what it expressly pled in its

25   breach-of-contract claim.  It asserted a breach of the 2015 MSA because Safeway terminated that

26   contract.  To the extent Premier takes issue with not being selected as a vendor pursuant to the

27   2017 RFP, that may be a violation of some other right, but it is not a breach of the 2015 MSA.

28   Thus, any claim for damages for loss of future contracts (as suggested in the initial disclosures) is

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1   irrelevant.  *See* Wecker Decl., Ex. B (initial disclosures attaching Allman expert report on

2   damages).

3        Accordingly, Premier's claim for breach of contract is one "arising under" the 2015 MSA.

4   Since Safeway prevailed on this claim at summary judgment, it is entitled to fees related to the

5   cause of action.[3]

6   E.        Fraud and Civil Conspiracy

7        While it is clear that the claim for breach of contract addressed by the Court's summary

8   judgment ruling "arises under" the 2015 MSA, the same is not true for the tort claims (fraud and

9   civil conspiracy).  As noted above, in the original complaint, Premier alleged fraud on the basis

10  that Safeway conducted a "sham RFP bidding process" that favored King and "did not permit

11  Premier to have a fair and equal opportunity to bid for its contracts."  Compl. ¶ 34.  (Premier

12  dropped the fraud claim in its FAC.)  For the civil conspiracy claim (pled in both the original and

13  amended pleadings), Premier alleged that the union violated the LMRA by engaging in a

14  secondary boycott and that Safeway was responsible for the harm suffered by Premier "because it

15  joined in a conspiracy to commit these activities by joining with the Union and King to implement

16  an unfair and sham bidding process that resulted in King replacing Premier as Safeway

17  contractors."  Compl. ¶ 43; FAC ¶ 40.

18       In assessing whether the fraud and civil conspiracy claims "arise under" the 2015 MSA,

19  the Court examines more closely what exactly the phrase "arising under" means.

20       Case law interpreting similar phrases – *e.g.*, "arising from" or "arising out of" – indicate

21

22  [3] As noted above, at summary judgment, Safeway prevailed on the claim for breach of contract

23  because it was allowed to terminate the 2015 MSA prior to the "regular" termination date of
    December 2018.  When Safeway issued the 2017 RFP, one of its provisions was that an incumbent

24  services provided (such as Premier) who responded to the RFP agreed that Safeway could
    immediately terminate an existing agreement between the companies, regardless of the terms of

25  that agreement, and would not incur any liability for doing so.  *See* Docket No. 82 (Order at 15-
    16).  "Faced with this evidence, Premier completely dropped the theory that Safeway breached the

26  2015 [MSA]" and "made no substantive response to Safeway's argument" at summary judgment.
    Docket No. 82 (Order at 16).  Instead, Premier pivoted to a completely new factual theory for

27  breach of contract/implied covenant.  *See* Docket No. 82 (Order at 16) (noting that new factual
    theory was that "Safeway breached the implied covenant because, implicitly, with the RFP,

28  'Safeway both promised a fair and thorough bid process and owed a duty to abide by laws and
    governmental rules'").)

1    that the phrase should not be given a narrow meaning.  For example, one might construe a claim

2    "arising from" or "arising out of" an agreement to mean a contract-based claim only (*e.g.*, a claim

3    to interpret a contract or a claim to enforce a contract), and not a tort claim.  But several courts

4    have expressly rejected that narrow interpretation.

5            For example, in *Xuereb v. Marcus & Millichap, Inc.*, 3 Cal. App. 4th 1338 (1992), the

6    court considered a real estate purchase agreement which contained the following fee provision:

7    "'If this Agreement *gives rise to* a lawsuit or other legal proceeding between any of the parties

8    hereto, including Agent, the prevailing party shall be entitled to recovery actual court costs and

9    reasonable attorneys' fees in addition to any other relief to which such party may be entitled.'"  *Id.*

10   at 1340 (emphasis added).  The court stated that this language "does not limit an award of attorney

11   fees to actions brought on a breach of contract theory, or to actions brought to interpret or enforce

12   a contract. . . . The language is broad enough to encompass both contract actions and actions in

13   tort."  *Id.* at 1342-43.

14           Similarly, in *Santisas* (decided about six years after *Xuereb*), the California Supreme Court

15   considered a contract that had the following fee provision:

16             "In the event legal action is instituted by the Broker(s), or any party
               to this agreement, or *arising out of* the execution of this agreement
17             or the sale, or to collect commissions, the prevailing party shall be
               entitled to receive from the other party a reasonable attorney fee to
18             be determined by the court in which such action is brought."

19   *Santisas*, 17 Cal. 4th at 603 (emphasis added).  The Court stated that

20             If a contractual attorney fee provision is phrased broadly enough, as
               this one is, it may support an award of attorney fees to the prevailing
21             party in an action alleging both contract and tort claims: "[P]arties
               may validly agree that the prevailing party will be awarded attorney
22             fees incurred in any litigation between themselves, whether such
               litigation sounds in tort or in contract."
23

24   *Id.* at 608.

25           Courts have also indicated that phrases similar to "arising under" should not be narrowly

26   construed to mean that a contract or tort claim must have a causal relationship with the agreement

27   containing the fee provision; a claim simply needs to have a clear transactional relationship to the

28   contract which contains the fees provision.  Again, *Xuereb* is instructive.  In *Xuereb*, the

United States District Court
Northern District of California

1    defendants were a real estate broker and a real estate agent.  As agents, they executed a purchase

2    agreement with the plaintiffs in a real estate transaction in which the plaintiffs were the purchasers

3    of certain real property.  The plaintiffs sued the defendants, alleging that the defendants (as well as

4    the sellers of the real property) had delivered the real property to the plaintiffs in defective

5    condition.  At trial, the plaintiffs submitted their claims for negligence, breach of fiduciary duty,

6    and fraud to the jury.  The jury returned a verdict in favor of the defendants on all claims.  The

7    defendants subsequently moved for attorneys' fees based on the fee provision in the purchase

8    agreement, but the trial court denied the motion.  *See Xuereb*, 3 Cal. App. 4th at 1341.

9    　　　On appeal, the question was whether the purchase agreement "gave rise to" plaintiffs'

10   claims – or to state the matter slightly different, did the plaintiffs' claims "arise from" the purchase

11   agreement.  The court noted that, "[i]n ordinary popular speech, as well as in legal opinions, it is

12   common to use the phrase 'arises from' or 'arises out of' *in a far more general, transactional*

13   *sense* than is suggested by phrases such as 'derives from' or 'proximately caused by.'"  *Id.* at 1344

14   (emphasis added).  Accordingly, the court agreed with the defendants that they were entitled to

15   fees because "the litigation has arisen from the entirety of the circumstances of the real estate

16   transaction of which the Purchase Agreement was the defining statement."  *Id.* at 1343.  The court

17   disagreed with the plaintiffs that the litigation did not arise from the purchase agreement simply

18   because "the alleged actions, omissions, or misstatements with which that dispute was concerned[]

19   all occurred prior to the execution of the Purchase Agreement."  *Id.*

20   　　　The court added that the defendants' interpretation was

21   　　　　　buttressed by the interpretational principle that a contract must be
　　　　　understood with reference to the circumstances under which it was
22   　　　　　made and the matter to which it relates.  The circumstances of the
　　　　　Purchase Agreement and the matter to which it related was a large
23   　　　　　real property transaction, in which the buyer and the seller made
　　　　　certain reciprocal agreements with respect to the inspection of the
24   　　　　　premises and a variety of contingencies which were supposed to
　　　　　take place prior to the close of escrow.  It was out of these
25   　　　　　contingencies, or the alleged failure thereof, that the lawsuit arose.
　　　　　The attorney fees provision specifically included the "Agent" among
26   　　　　　the parties with respect to which disputes could arise that would
　　　　　trigger a right to attorney fees.  In light of all these circumstances,
27   　　　　　we conclude that the phrase "gives rise to" must be interpreted
　　　　　expansively, to encompass acts and omissions occurring *in*
28   　　　　　*connection with* the Purchase Agreement and the entire transaction

10

1          of which it was the written memorandum.

2   *Id.* at 1344 (emphasis added); *see also id.* (stating that the plaintiffs' tort claims "arose from the

3   underlying transactional relationship between the parties, as memorialized by the Purchase

4   Agreement"; the claims were not independent of the basic contractual arrangement). *Accord*

5   *Lerner v. Ward*, 13 Cal. App. 4th 155, 160 (1993) (where purchase agreement had fee provision

6   for claims "arising out of" the agreement, holding that claim for fraud was such a claim; plaintiffs

7   had sued defendants for making false representations that induced plaintiffs to enter into the

8   purchase agreement); *Adam v. DeCharon*, 31 Cal. App. 4th 708, 712 (1995) (where purchase

9   agreement had fee provision for claims "arising out of" the agreement, holding that tort claim was

10  such a claim; plaintiffs alleged that defendant had failed to comply with California Civil Code §

11  1102 by not making disclosures related to the real property purchased – "[b]ut for the agreement to

12  purchase, there would be no cause of action for violation of section 1102"); *see also In re Rogers*,

13  No. EC-11-1138-KiDju, 2011 Bankr. LEXIS 5300, at *30-32 (9th Cir. BAP Dec. 28, 2011)

14  (stating that "[a] contract provision authorizing fees in an action to interpret or enforce the contract

15  does not permit attorney's fees on tort claims," but the fee provision under consideration – which

16  used "arising out of" language – was "not so limiting"; because the parties did not claim that

17  "arising out of" had a special meaning, the panel "interpret[ed] that phrase in its ordinary and

18  popular sense[:] [t]o 'arise' means 'to originate from a source' or 'to come into being or to

19  attention'").

20          Even under a more capacious construction of "arising under," Premier's tort claims here

21  (fraud and civil conspiracy) did not arise under the 2015 MSA.  The tort claims asserted are about

22  an unfair and sham bidding process in conjunction with the 2017 RFP.  That bidding process was

23  *independent* of Premier and Safeway's services relationship governed by the 2015 MSA.  The

24  2017 RFP was open to all vendors, including those that were not party to a 2015 MSA or similar

25  contract.  The only connection between the 2017 RFP and 2015 MSA was that, as noted above, by

26  responding to the RFP, Premier agreed under the terms of the 2017 RFP that Safeway could

27  immediately terminate the 2015 MSA.  *See* note 3, *supra*.  The tort claims concern the fairness of

28  the 2017 bidding process, of which the 2015 MSA was neither proximately related nor a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    transactional predicate.

2         Safeway argues still that Premier's theory of the case was that Safeway terminated the

3    2015 MSA because of its conspiracy with the union and King.  Safeway asserts:

> Plaintiff claimed that the aim of [the] boycott was to force Safeway
> to stop doing business with Plaintiff – that is to terminate the 2015
> MSA on March 15, 2018.  Therefore, because Plaintiff's
> extracontractual claims would not exist without the underlying
> relationship outlined in the 2015 MSA, those claims "arise under"
> the contract.

8    Mot. at 5; *see also* FAC ¶ 37 (alleging that, "[o]n or about March 25, 2018, Safeway breached the

9    agreement by terminating Plaintiff for reasons of its concerted activities with the labor union

10   representing Premier's Employed").

11        But Safeway's first sentence above establishes – at most – why the claim for breach of the

12   contract is one that "arises under" the 2015 MSA.  That does not make the second sentence true.

13   Indeed, the fraud and civil conspiracy claims are about the *future* relationship between Premier

14   and Safeway (in conjunction with the 2017 RFP), not the *already existing* one under the MSA.  *Cf.*

15   *Rogers*, 2011 Bankr. LEXIS 5300, at *22 (holding that fraud claim did not arise out of purchase

16   agreement because "Patterson's fraud claim arose from his role as lender to Gridiron, not as the

17   seller in the Purchase Agreement for Heritage Park.").  That is, Safeway's alleged tortious conduct

18   did not "arise from" the 2015 MSA because it was not legally predicated upon or transactionally

19   based on the 2015 MSA.  Though the early termination of the 2015 contract may have been an

20   incidental casualty of the tortious conduct, the gravamen of the tort claims was Safeway's conduct

21   in relationship to the prospective 2017 transaction, not the prior 2015 agreement.

22        Accordingly, the Court rejects Safeway's position that the fraud and civil conspiracy

23   claims "arose under" the 2015 MSA.

24   F.    Inextricably Intertwined

25        Safeway argues that, even if the fraud and civil conspiracy claims did not "arise under" the

26   2015 MSA, they are still inextricably intertwined with the claim for breach of contract that *did*

27   "arise under" the agreement – and therefore, it should be awarded all of its fees.  Safeway asserts:

28   "Plaintiff's 'civil conspiracy' and 'fraud' claims each turned on Safeway's alleged conspiracy with

12

1    the union and King to terminate its contractual relationship with Plaintiff." Mot. at 5.   The

2    problem with this argument is, as noted above, it does not matter *why* Safeway (allegedly)

3    breached the 2015 MSA.  Either Safeway breached the terms of the contract by terminating before

4    the "regular" December 2018 termination date, or it did not.  Safeway's motive is not material to

5    that breach of contract claim.  Thus, the breach-of-contract claim is not inextricably intertwined

6    with the fraud and civil conspiracy claims.

7           Safeway contends still that it "had to defend the breach of contract action by defense of the

8    validity of the RFP process for it provided the basis of Defendants' valid termination of the 2015

9    MSA."  Fee Reply at 5; *see also* Fee Reply at 6 ("Defendants had no choice but to expend

10   resources proving the propriety of the RFP process to defeat Plaintiff's breach of contract claim.").

11   That is not correct.  Premier did not take issue with the terms of the 2017 RFP (which allowed

12   Safeway to terminate the 2015 MSA once Premier participated in the RFP process).  What

13   Premier had a problem with was how Safeway actually carried out the bidding process.  Thus, all

14   Safeway had to do to defend the claim for breach of contract was point to the express terms of the

15   2017 RFP which gave Safeway the right to immediately terminate the 2015 MSA if Premier

16   submitted a response to the RFP – *which is exactly what Safeway did at summary judgment*.

17   Safeway did not have to justify how it actually carried out the ensuing bidding process to defend

18   against the claim for breach of contract.

19   G.      Amount of Fees

20          Based on the Court's analysis above, Safeway's motion for fees has merit only to the

21   extent Safeway seeks fees for defending the claim for breach of contract.  The problem is that

22   Safeway has not – not even in the alternative – offered a way to differentiate between the fees

23   related to the claim for breach of contract and the fees related to the tort claims.  This may have

24   been a strategic decision on the part of Safeway, *i.e.*, so that it could stick to the position that all

25   claims are inextricably intertwined.  And it was probably a decision that Safeway could roll the

26   dice on because, in all likelihood, the fees related *solely* to the claim for breach of contract are not

27   that significant.  As noted above, to defeat the claim for breach of contract, all Safeway had to do

28   (*as it did at summary judgment*) was point out that the 2017 RFP gave it the authority to

United States District Court
Northern District of California

1    immediately terminate so long as Premier responded to the RFP.

2            Because Safeway has made no attempt to allocate fees, the Court could arguably grant the

3    motion for fees but award it $0.  However, the Court shall grant *some* fees in light of Premier's

4    calculation as to what fees were incurred for the claim for breach of contract only.

5            As background, Safeway has asked for a total of $578,077 in fees.  *See* Fee Mot. at 8.  This

6    represents the fees incurred to litigate the entirety of the case, not just the claim for breach of

7    contract.  There were two firms that incurred fees in this litigation: the Riley firm and the

8    Lafeyette firm.

9            • The Riley firm was Safeway's main counsel.  The firm spent 1,157 hours on the

10               case and charged Safeway for 1,047 of those hours.  *See* Fee Mot. at 7-8.  The

11               hourly rates for the main attorneys working on the case were $400-550.  A few

12               other attorneys worked on the case who had hourly rates of $340-400.

13               Nonattorneys working on the matter billed $295-310 per hour.  *See* Fee Mot. at 6-7.

14            • The Lafeyette firm represented Safeway from only May 2021 to July 2022.  The

15               firm spent 259 hours on the case – related to "removal, initial case management

16               tasks, and preparation for the first mediation in this case, which ultimately did not

17               occur . . . ."  Fee Mot. at 7.  The lawyers had hourly rates of $325-400.  There was

18               one nonattorney who billed $100 per hour.  *See* Fee Mot. at 7.

19           In its papers, Premier notes that it did not reach the same total that Safeway did in

20   calculating fees.  *See* Wecker Decl. ¶ 9.  But putting that point aside, Premier suggests that, to

21   defend the claim for breach of contract, Safeway incurred fees of about $8,815.  *See* Wecker Decl.

22   ¶ 10.  Premier reached this amount by looking at the billing records submitted by Safeway and

23   looking for terms that could relate to the claim for breach of the 2015 MSA.  *See* Wecker Decl. ¶¶

24   6-8 & Exs. 4-6 (providing a "summary of Defendant's invoice entries relating to the breach of

25   contract claim or otherwise referencing contracts, agreements or the 2015 MSA" and then

26   "Plaintiff's analysis of the invoices").

27           In the alternative, Premier suggests that the Court award "1-5% of the requested fees"

28   which would be $5,780-$28,903 (accepting the fee total claimed by Safeway).  Premier argues that

United States District Court
Northern District of California

1    this low percentage is justified given that the record as a whole suggests that, at most, little time

2    was spent on the claim for breach of the 2015 MSA:

> The parties spent virtually no resources in disputing the
> interpretation or performance of the 2015 MSA.  None of the
> Safeway/Albertson witnesses were shown the 2015 MSA.  Its only
> appearance during the several depositions taken in the case was
> during Premier's deposition, marked as Exhibit 2.  The discussion of
> its terms and conditions of that contract covered only five pages of a
> two-day, 461-page transcript.  A true and correct copy of those five
> pages is attached to the Wecker Decl. in Opp. Attorney's Fees as
> Exh. 3.  Similarly, the 165-page declaration that Defendants
> submitted in connection with their motion for summary judgment
> made reference to the 2017 RFP 142 times in contrast to two (2)
> references to the 2015 MSA.

10   Opp'n to Fees at 16.

11        The Court finds it fair to award Safeway $8,815 in attorneys' fees given Premier's first

12   calculation above, which seeks to tie fees to work specifically done on the 2015 MSA.  The Court

13   also notes that a small fee award is not unexpected given that, as indicated above, all that Safeway

14   had to do to defend against the contract claim was point to the provision in the 2017 RFP that

15   allowed it to terminate once Premier participated in the RPF process.

### III.    CONCLUSION

17        For the foregoing reasons, the Court grants in part and denies in part Safeway's fee motion.

18   Safeway is entitled to fees with respect to Premier's claim for breach of contract only.  That is the

19   only claim that arose under the 2015 MSA.  Fees in the amount of **$8,815** are awarded.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1         The Court notes that Safeway may or may not be entitled to more fees pursuant to its

2 sanctions motion.  The Court now sets that motion for hearing on January 16, 2025, at 1:30 p.m.

3 Without prejudging that motion, the Court suggests that it may behoove the parties to engage in

4 settlement discussions in light of the rulings the Court has issued to date but which are subject to

5 Premier's appeal to the Ninth Circuit.

6         This order disposes of Docket No. 88.

7         **IT IS SO ORDERED**.

8

9 Dated: November 20, 2024

10

11 _____

12 EDWARD M. CHEN
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28